908 F.2d 763
 Kenneth MERCER, Tom Tioran, David Tootle, Edward Koraski,
pre-trial detainees in the Chatham County Jail,
Indv. and on behalf of all others
similarly situated, Plaintiffs-Appellees,
v.
Walter MITCHELL, Indv. and in his capacity as Sheriff of
Chatham County, Ga., Luke Simms, Indv. and in his capacity
as Chief Jailer of the Chatham County Jail; J. Tom Coleman,
Willie Brown, Frank O. Downing, Cleve Fountain, Walter
Matthews, Robert L. McCorkle, George A. Mercer, III, J.
Albert Sadler, and L. Scott Stell, Indv. and in their
respective capacities as Commissioners of Chatham County,
Georgia, Defendants-Appellants.
 No. 89-8267.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 8, 1990.
Rehearing Denied Oct. 4, 1990.
 
 Emily E. Garrard, Savannah, Ga., for defendants-appellants.
 James F. Bass, Jr., Savannah, Ga., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before TJOFLAT, Chief Judge, ANDERSON and CLARK, Circuit Judges.
 TJOFLAT, Chief Judge:
 
 
 1
 The civil contempt power of the United States courts is limited to "the least possible power adequate to the end proposed." Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821). The appellants (the County)[1] claim that the district court exceeded this power by fining the County $30,600 for operating a county jail in violation of prior court orders. Although we will vacate a district court's exercise of its contempt power only when we find that the court abused its discretion, see Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1534 n. 4 (11th Cir.1986), we agree with the County and conclude that the district court did abuse its discretion here. We therefore vacate the district court's judgment.
 
 I.
 
 2
 This case began in 1974, when a group of prisoners filed a section 1983 class action suit, see 42 U.S.C. Sec. 1983 (1982), claiming that the Chatham County Jail was being operated in violation of the United States Constitution. According to the plaintiffs in that suit, the jail was extremely overcrowded, and the defendant (the County) essentially agreed. The County announced plans to build a new jail facility, and the litigation abated during construction of that facility.
 
 
 3
 When the facility was completed, the class of jail inmates (with appellee Mercer as one of the named plaintiffs) again challenged the constitutionality of conditions prevailing in the facility. The litigation ultimately resulted in a district court order of November 19, 1981, in which the court placed a temporary cap of 446 inmates on the jail and ordered county officials to reduce the jail population to a "manageable" level. Approximately one year later, the plaintiffs moved the court to exercise its civil contempt power in light of the County's failure to comply with the November 19, 1981 order. The court stated, in response to that motion, that it was not "convinced ... that, at this point, sanctions available upon a finding of civil contempt would ensure compliance with the law." (Emphasis in original.) The court therefore deferred ruling on the plaintiffs' motion.
 
 
 4
 One year later, the plaintiffs again requested the court to hold the County in contempt for failure to comply with the prior court orders on overcrowding. Again, the court refused to hold the County in contempt; it did, however, reduce the cap to 381, granting permission to exceed the cap only temporarily in bona fide emergencies.
 
 
 5
 Finally, on February 23, 1988, the court entered an order directing the County to show cause why it should not be held in contempt and sanctioned accordingly for failing to comply with the court-ordered cap on the jail population. After conducting a hearing on the matter, the court concluded that its order had been disregarded, "but not maliciously." The court then raised the cap to 389 (eight additional beds had been added) and stated that
 
 
 6
 [f]or any portion of a day that prisoners exceeding the cap [of 389] are in the jail, a fine of at least One Hundred Dollars ($100) per prisoner will be assessed against the County Commissioners, and will be paid into this court as a fine; not to be refunded to the county.
 
 
 7
 The court concluded with an admonition: "The Order will be enforced." Significantly, however, the court never held the County in contempt.
 
 
 8
 On October 6, 1988, the jail population reached 393. By the end of the day, however, jail officials managed to reduce the population to comply with the cap of 389. In response to this temporary increase in inmate population, the plaintiffs moved the court to hold the County in civil contempt of court and impose sanctions. The court conducted a hearing and imposed a fine of $100 per day for each of the four prisoners held in excess of the cap. In its order of November 9, 1988, however, the court never found the County to be in contempt; it merely imposed a fine "in accordance with" its order of February 24, 1988.
 
 
 9
 During the weeks following the November 9 order, the jail population exceeded the cap several times. On January 25, 1989, the plaintiffs again moved the court to find the County in contempt and to impose sanctions. The court did not enter an order directing the defendants to show cause why they should not be held in contempt, nor did it conduct a hearing on the matter. Instead, on February 7, 1989, the court ordered the County to pay a fine of $200 per day (or every part thereof) for every prisoner held in violation of the cap. The court never mentioned whether it was holding the County in contempt; it merely directed the parties to submit a statement to the court indicating the number of prisoners held in violation of the cap. Although the court discussed the efforts made by county officials to resolve the overcrowding problem, it concluded with a notable statement: "The Court will accept no excuses for not complying with its Order."
 
 
 10
 On February 8, counsel for the plaintiffs certified to the court the number of prisoners held in violation of the cap. On February 9, the Chatham County Board of Commissioners met to discuss plans to alleviate the overcrowding situation and, on February 10, approved an expenditure of $175,000 to accelerate completion of a new jail facility. On the same day, at 10:47 a.m., the court imposed a fine of $30,600 based on the plaintiffs' certification. The court did not give the County an opportunity to show cause why it should not be held in contempt.
 
 
 11
 That afternoon, the County moved the court to modify the cap. The court held an in-chambers hearing, during which it determined that the County could safely accommodate thirty more prisoners for short-term periods. The court therefore entered an order allowing the County to exceed the cap by thirty prisoners during weekends and in emergency situations, provided that, within forty-eight hours of the next weekday, the population was reduced to 389. The court noted that this measure was temporary and would expire on May 8, 1989--after the new jail facility was due to be completed.
 
 
 12
 On February 22, 1989, the County moved the court to reconsider its order imposing the fine of $30,600. The County argued that, had the court known of the Board of Commissioners' decision on February 10 to expend an additional $175,000 to expedite completion of the new jail facility, the court would not have imposed the fine that same day. The court denied that motion, and the County now appeals the court's judgment embodied in the orders of February 7, 1989 and February 10, 1989. We conclude that the court imposed the fine without providing the County due process of the law. We therefore vacate the court's judgment imposing the fine and remand for further proceedings consistent with this opinion.
 
 II.
 
 13
 Although a district court has a certain amount of discretion in fashioning civil contempt sanctions and the procedure by which those sanctions are imposed, the court must stay within the bounds of due process. When the purportedly contumacious conduct occurs outside the presence of the court,[2] due process requires, with very few exceptions,[3] that the defendant[4] (1) be informed, through a show-cause order,[5] of his purportedly contumacious conduct, and (2) be given a hearing at which he can be represented by counsel, call witnesses, and testify in order to show cause why he should not be held in contempt. See In re Oliver, 333 U.S. 257, 275, 68 S.Ct. 499, 508, 92 L.Ed. 682 (1948); Cooke v. United States, 267 U.S. 517, 537, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925). From these skeletal requirements, courts have fashioned a typical (although by no means exclusive) contempt proceeding.[6] We outline that proceeding to show that the district court below substantially departed both from the model and from the requirements of due process.[7]
 
 
 14
 Every civil contempt proceeding is brought to enforce a court order that requires the defendant to act in some defined manner. The defendant then allegedly acts, or refuses to act, in violation of the order. The plaintiff would like the defendant to obey the court order and requests the court to order the defendant to show cause why he should not be held in contempt and sanctioned until he complies. See In re Birmingham Reverse Discrimination Employment Litig., 833 F.2d 1492, 1501 (11th Cir.1987), aff'd sub nom. Martin v. Wilks, --- U.S. ----, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). If the court finds that the conduct as alleged would violate the prior order, it enters an order requiring the defendant to show cause why he should not be held in contempt and conducts a hearing on the matter. See Newman v. State of Ala., 683 F.2d 1312, 1318 (11th Cir.1982), cert. denied, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983).
 
 
 15
 At the hearing, the defendant is allowed to show either that he did not violate the court order or that he was excused from complying. See id. Typically, a defendant will argue that he should not be held in contempt because changed circumstances would make strict enforcement of the order unjust. In such a case, the defendant should move the court to modify the order, and the hearing on the show-cause order would take on the appearance of a hearing on a motion to modify an injunction. See In re Birmingham, 833 F.2d at 1501. If the court determines that the order should be modified and that the defendant's conduct did not violate the order as modified, then ordinarily it would be unjust to hold the defendant in contempt.[8] But see infra note 8 (discussing circumstances in which such a holding would be just). If, however, the court concludes that the order should not be modified and that the defendant did not comply with the order, then the court may hold him in contempt and impose sanctions designed to ensure compliance.[9] Thus, the typical proceeding satisfies the two essential requirements of due process: notice and hearing.
 
 
 16
 The proceedings under scrutiny today look nothing like the typical civil contempt proceeding. Initially, the court ordered that a cap be placed on the jail population. When the population exceeded that cap, the plaintiffs instituted a contempt proceeding, but the court, in its February 23, 1988 order, refused to hold the County in contempt for its past conduct. Instead, it merely declared that it would enforce its order with fines in the future. In essence, that order represented something akin to a traffic ordinance, in which a speed limit and schedule of fines are established for future conduct. The order did not, and could not, constitute a holding that certain future conduct would be contumacious: such a holding would deprive the County of its due process right to show cause why it should not be held in contempt.
 
 
 17
 In its order of February 7, 1989, the court again departed from the model of civil contempt when it directed that the County be fined $200 per prisoner per day. The court did not enter a show-cause order or conduct a hearing; indeed, it stated that it would not accept any excuses for violating its previous orders. As we note above, however, a defendant should always be given an opportunity to show that changed circumstances would make holding him in contempt unjust. The court implicitly stated that, "even if I were to conduct a hearing on this matter, it would do you no good. I have already decided against you." Clearly, this was not a proper contempt proceeding: the court, without ever finding the County to be in contempt, simply enforced its quasi-legislative ordinance of February 23, 1988. We think that the court ignored both the due process requirement of a hearing and the established principle that a court must allow the defendant an opportunity to request modification of the order based on changed circumstances.[10]
 
 
 18
 Finally, the court's order of February 10, in which the court calculated and imposed the $30,600 fine, is similarly flawed. No show-cause order or hearing preceded the order, and we assume that the court acted in accordance with its statement three days earlier that it would accept no excuses. Again, the court made no finding of contempt. For the reasons stated above, this proceeding represents a substantial departure from the typical contempt proceeding and from the requirements of due process.[11]
 
 
 19
 Because the court's orders of February 7, 1989 and February 10, 1989 were entered in violation of the County's due process rights, we vacate the court's judgment and remand for further proceedings consistent with this opinion.
 
 III.
 
 20
 As a final matter, we note that the district court's handling of these contempt proceedings reflects a basic misunderstanding of the purpose of court-imposed caps on prison populations and the proper method of enforcing such caps. We pause briefly to explain.
 
 
 21
 A court imposes a cap on a prison population for one reason: to ensure the safety of the convicted inmates and pretrial detainees in compliance with the eighth amendment, and the due process clauses of the fifth or the fourteenth amendments. Therefore, the court evaluates the facility, the number of beds and cells available, and the number of guards and staff members to determine the maximum number of inmates that can safely be held in the facility. If a court finds that, after a cap has been set, the prison officials have added more guards or more beds, and if the officials can convince the court, upon motion to modify the cap, that, even with more inmates, the facility meets the constitutional requirements, the court may raise the cap accordingly.
 
 
 22
 Court-ordered caps are most frequently enforced through the court's civil contempt power. Thus, when a defendant operates the facility in violation of the cap, the plaintiff may institute contempt proceedings. The court issues a show-cause order and conducts a hearing: if the defendant does not move to modify the cap, or if the defendant does move and the motion is denied, then the court imposes sanctions to coerce the defendant into compliance with the order. The contempt proceeding, however, should never be conducted in a vacuum--the court must always be mindful of the cap's purpose.
 
 
 23
 When a driver of a large, luxury sedan substantially exceeds the highway speed limit, he might offer as an excuse to the police officer that the purpose of speed limits is to ensure the safety of persons using the roads. A large, luxury sedan, the driver would add, is built to operate safely at much higher speeds than, say, a compact automobile. Therefore, according to the driver, the officer should keep in mind the purpose of speed limits and not punish the driver. The ticket, nevertheless, issues. A court's authority to hold a party in contempt, however, is nothing like a police officer's duty to issue citations for every violation of the traffic ordinances. A court has discretion, and it should exercise its discretion to hold a party in contempt only when doing so would vindicate the purpose of the underlying order. Thus, if the prison officials move at the show-cause hearing to modify the cap because the facility can safely handle more inmates, then we see no reason to hold the officials in contempt for conduct that would not be contumacious under the modified cap.
 
 
 24
 In this case, approximately five hours after the court had imposed the $30,600 fine on the County, the County moved the court to modify the cap, and the court held an in-chambers hearing on the matter. At the hearing, the County convinced the court that it could safely hold an additional thirty inmates in the jail in certain temporary situations. The plaintiffs agreed, and the court modified the cap accordingly. If the court had conducted a show-cause hearing prior to its February 7 or February 10 orders, presumably the County would have offered the same evidence regarding the safety of inmates in certain temporary situations when the population exceeded the cap. But, according to the court, it would not accept any excuses. This rigid approach to enforcing the cap explains the court's departure from the requirements of due process: if no excuse (including proof that, due to changed circumstances, the violation did not increase the risk of harm to the inmates) would be accepted, then there was no reason to conduct a hearing. Thus, the court's fundamental misunderstanding of the cap's purpose led to its deprivation of the County's due process rights. And the departure is even more striking given the evidence in the record that, had a show-cause hearing been conducted prior to the February 7 and February 10 orders, the court probably would have granted the County's motion to modify the cap at that time.
 
 
 25
 We hope that, in the future, district courts will consider the purpose of enforcing caps before entering coercive orders like those entered in this case. Failure to do so will inevitably lead to a derogation of procedural rights, as in this case, and will undermine the public's respect for judicial authority, especially when used to coerce compliance for no discernible reason.
 
 IV.
 
 26
 For the foregoing reasons, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.
 
 
 27
 VACATED and REMANDED.
 
 CLARK, Circuit Judge, dissenting:
 
 28
 Today, the majority interprets the due process clause to require that a district court issue a show cause order and hold a hearing before it can impose civil contempt sanctions on a defendant who has repeatedly violated its orders. Because I find this extension of the fifth amendment unwarranted and unprecedented, I respectfully dissent.
 
 I. Facts and Prior Proceedings
 
 29
 The plaintiffs in this case, the pre-trial detainees and prisoners housed in the Chatham County Georgia Jail, brought a Title 42 U.S.C. Sec. 1983 action against the Chatham County officials responsible for maintaining the jail. The suit was filed in 1974 and was later certified as a class action. The plaintiffs' complaint alleged that the conditions in the jail violated their constitutional rights under the eighth and fourteenth amendments to the federal constitution. There can be no dispute regarding the conditions at the jail at that time--the defendants themselves conceded that the conditions were "atrocious." R2-205 at 2.
 
 
 30
 The County responded to the litigation by agreeing to construct a new jail. The litigation abated during the construction of this new facility which was completed in 1978. The new facility suffered from many of the same problems as the original jail. After the plaintiffs challenged the conditions at the new facility, U.S. District Court Judge B. Avant Edenfield on February 27, 1981 approved a proposed settlement of these claims by the parties with a final order in the case. The order set forth standards in the areas of medical care, recreation, and staffing, and management.
 
 
 31
 In August 1981, the plaintiffs sought to hold the defendants in contempt for failing to abide by the terms of the decree. In October, after personally visiting the jail and holding a hearing, Judge Edenfield concluded that "virtually every particular of the consent order had been violated." R1-73 at 2. The court found that the consent "decree had been all but completely ignored." Id. at 5. It was at this time that the court first recognized that overcrowding was becoming a problem. Rather than set a population cap, the court froze the number of inmates and gave the County thirty days to reduce the prison population to a "manageable level."[1] Id. at 6. Judge Edenfield declined to hold the defendants in contempt at that time even though he concluded that "there is certainly no doubt that these facts support a finding of contempt." Id. at 2. Rather, the court delayed consideration of a contempt finding to allow the defendants another chance to comply with the orders in the case.
 
 
 32
 One year later not much had changed at the Chatham County Jail. The plaintiffs moved for a finding of contempt and the appointment of a monitor. The court, after holding a hearing, concluded that "the evidence presented ... conclusively demonstrates that the jail is not being operated in accordance with the Consent Order and subsequent Orders or with the constitutional requirements." R1-120 at 5. The court characterized the defendants efforts at compliance as "delays[,].... a few improvements, ... and a chorus of promises to try harder." Id.
 
 
 33
 Although there were many problems with the jail, most were related to the severe overcrowding at the facility. The court found that overcrowding was "the chief evil to be eradicated in jail facilities." Id. at 8. Since the November 1981 order, the jail population had steadily increased falling below the design capacity of 381 inmates only once. During the period from April 1982 to the end of the year the population did not fall below 400. The number of prisoners was especially alarming given the testimony that the manageable population was approximately 30 to 50 inmates less than the 381 inmates contemplated by the designers of the jail. See id. at 13.
 
 
 34
 Once again, the court refused to hold the county in contempt. The court, based in part on this court's opinion in Newman v. Alabama, 683 F.2d 1312 (11th Cir.1982), cert. denied, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983), noted that a finding of contempt was an "appropriate response" in the face of the defendants noncompliance. R1-120 at 21. Rather than find the defendants in contempt, however, the court again deferred ruling on the plaintiffs' motion--this time for 120 days. The court did appoint a monitor to aid the defendants in implementing the court's orders and to assist the court in determining the defendants' compliance.
 
 
 35
 On January 10, 1984, after receiving a report from the monitor, the court lowered the prisoner cap to 381, the maximum design capacity of the jail. R1-168 at 10. The court did so after finding that the overcrowding problems at the jail were preventing the Sheriff and the jail officials from implementing the provisions of the consent order. Id. The court noted that this new cap exceeded the manageable number of prisoners by 46 inmates. Id. The court also noted that the defendants' conduct again justified a contempt finding, but rather than impose sanctions, the court stated its belief that the directions provided in the order and the court's previous orders would accomplish more than a coercive contempt sanction. Id. at 13.
 
 
 36
 On February 23, 1988, the plaintiffs filed their third petition for contempt. The population data indicated that the defendants had exceeded the cap on numerous occasions. R2-179. The court issued a show cause order and held a hearing the next day. After hearing the testimony presented by the parties, the court issued an order raising the cap to 389 prisoners because the county had created additional space for male prisoners. This order, issued February 24, 1988, also found that the previous orders had been "disregarded, although not maliciously." R2-183 at 1. While it is true that the court did not hold the defendants in contempt at this time, the court did give the defendants notice that this was their last chance:
 
 
 37
 [The defendants] are placed under order of this Court in their official capacity and individually. They are hereby ordered in each capacity to adhere to the classification system and the population "cap" established previously by Order of this Court, and by consent of the parties....
 
 
 38
 ....
 
 
 39
 For any portion of a day that prisoners exceeding the cap are in the jail, a fine of at least One Hundred Dollars ($100) per prisoner will be assessed against the County Commissioners, and will be paid into this court as a fine; not to be refunded to the county.
 
 
 40
 If that does not work, then the Court will view the failure to manage the population consistent with the Court's Order as willful disobedience.
 
 
 41
 ....
 
 
 42
 The Order meets barely minimal constitutional guidelines. Every effort has been made since 1974, when this action was commenced, and over the succeeding fourteen year period, to accommodate the limited budget and financial resources of the county and the taxpayers. The proof has been that, in response, the fabric has been stretched as far as it was allowed to stretch. From the evidence we have seen here today, the Court's Orders have been ignored, although not deliberately or willfully. The Court recognizes that those who must manage public affairs rarely are given the support and tools they need. What they are given are demands by people who do not realize the limitations. But, it has gone as far as it can go.
 
 
 43
 The Court need say no more. The Order will be enforced.
 
 
 44
 R2-183 at 3-4.
 
 
 45
 On October 6, 1988, the jail population exceeded the new cap by four inmates. The plaintiffs moved for sanctions for the fourth time in the case. The defendants responded to the motion and argued that sanctions were not appropriate because the defendants did not willfully violate the order and acted immediately to reduce the population to comply with the cap. R2-187 at 1-2. Although the court did not issue a show cause order, the court held a hearing where the defendants submitted evidence to support the assertions in their response. The court rejected these defenses as inadequate, found the defendants in contempt, and imposed a $400 sanction.[2] R2-188.
 
 
 46
 During the period between the first contempt finding and the February 7, 1989 finding of contempt at issue in this appeal, the defendants violated the cap on numerous occasions. The majority notes that the jail population exceeded the cap "several times." In reality the cap was exceeded 14 times by an average of almost 11 inmates each time. In addition, the number of inmates held in violation of the order was increasing with each additional violation. For example, during the last week of January, the number of inmates held in violation of the cap never exceeded ten. During the period from February 3, 1989 to February 8, 1989 the cap was exceeded every day by an average of over 17 inmates per day. See R2-197 (noting inmate figures). On February 7, the day that the court found the defendants in contempt, the cap was exceeded by 23 inmates. The next day the cap was still exceeded by 21 inmates.
 
 
 47
 The plaintiffs then filed their fifth motion for contempt on January 25, 1989, which was served on counsel for defendants by hand delivery that day. The defendants filed a response to this motion on February 6, 1989 along with a brief in opposition to the plaintiffs' motion for sanctions. The defendants did not request a hearing. The court did not issue a show cause order or hold a hearing. Rather, the court granted the motion and found the defendants in contempt. The court ordered the defendants to pay sanctions in the amount of $200 per inmate for each day the cap was exceeded since the last contempt finding. The majority notes that the court "discussed the efforts made by the county to resolve the overcrowding problem." Maj.Op. at 766. In actuality, the court discussed the county's "excuses" for disobeying the court's previous orders and rejected them as inadequate:[3]
 
 
 48
 The Sheriff has acknowledged the violation of the limitation and he offers excuses for not complying with the Order. He claims he is in a "catch 22" situation; if he releases felons he himself will be committing a felony and if he does not, he will be in violation of the Court's Order. This characterization of the Sheriff's dilemma is specious. In addition, other options, albeit costly and time consuming, may be available. For instances, the Sheriff acknowledges that bed space is sometimes available in the state system and that some prisoners have been transferred there to avoid exceeding the cap. The Sheriff may avail himself of this and any other option that he deems feasible until a better solution is found. Ultimately, however, either space is found or prisoners are to be released. Fines are not the answer, but only serve as a vehicle to encourage compliance.
 
 
 49
 R2-196 at 2-3 (footnote omitted) (February 7, 1989 order).
 
 
 50
 The majority again asserts (Maj.Op. at 766) that the district court did not find the county in contempt. The district court order states:
 
 
 51
 Mr. James Bass, attorney for the plaintiffs, has filed a petition for sanctions, alleging continued violations of the agreed to limitation. In response to the continuing violations, the court now directs that Chatham County pay $200 per day....
 
 
 52
 R2-196 at 1-2. The majority would require the court to use the magic word "contempt" in order to impose sanctions. For the reasons stated above it was clear to everyone that the court was finding the county in contempt. See Appellants' Brief at 18 (arguing that the district court erred because it failed to "comply with the [applicable] requirements of due process prior to holding a person in contempt " (emphasis added)). On February 8, 1989 the plaintiffs certified the dates and numbers of prisoners in excess of the cap. Two days later, the court entered an order calculating and imposing a $30,600 sanction.
 
 
 53
 On February 10, 1989, a few hours after the order imposing the $30,600 sanction was filed, the defendants filed an emergency motion to modify the cap. A hearing was held that afternoon. At the hearing, the defendants explained that the Chatham County Commission had that morning approved a plan to spend additional funds to advance completion of additional prisoner space currently under construction. The defendants then presented a proposed modification of the order imposing the cap whereby the defendants would be permitted to exceed the cap on weekends and emergencies. The defendants represented to the court that it would take steps to assure that sufficient bed space and staff were available to handle additional inmates during the times when the 389 prisoner cap was exceeded. After the plaintiffs consented to the order, the Court agreed to the modification.
 
 
 54
 Subsequently, the defendants filed a motion for reconsideration of the orders finding them in contempt and imposing the $30,600 fine. The defendants did not argue in their motion that the contempt order should be reconsidered because they had not received proper notice or a hearing. In addition, the defendants did not ask for a hearing on this motion. The court rejected this motion noting that the actions of the defendants after they were found in contempt both showed that the defendants were able to comply with the order and showed that the order achieved its intended effect of coercing the defendants into compliance.
 
 
 55
 II. Procedural Due Process and Civil Contempt
 
 
 56
 The defendants argue that the contempt sanction violated their rights to due process because they did not receive adequate notice and an opportunity to respond before the court imposed the sanctions. The majority accepts this argument and reverses the district court's sanction. I cannot accept either the decision to reach this question or the majority's resolution of the claim. I begin by considering whether this claim is properly before the court. Thereafter, I consider the merits of the defendants' due process claim.
 
 A. Waiver
 
 57
 It is established law in this circuit that absent exceptional circumstances, this court will not consider arguments raised for the first time on appeal. Just recently, the court in First Alabama Bank of Montgomery v. First State Ins. Co., 899 F.2d 1045, 1060 n. 8 (11th Cir.1990), this court explained this venerable doctrine:
 
 
 58
 First, it must be noted that even if meritorious, [the] failure to press the argument before the district court foreclosed [the party's] right to present it on appeal. See Royals v. Tisch, 864 F.2d 1565, 1568 n. 6 (11th Cir.1989); Lee v. United States Postal Serv., 774 F.2d 1067, 1069 n. 3 (11th Cir.1985) (per curiam); Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 360-61 (11th Cir.1984); Troxler v. Owens-Illinois, Inc., 717 F.2d 530, 532-33 (11th Cir.1983); Harris Corp. v. National Iranian Radio & Television, 691 F.2d 1344, 1353 (11th Cir.1982).... There is no question that this theory was merely an after-thought for if it were not the theory would most certainly have surfaced long before it did.... Concededly, our rule foreclosing review of issues not presented below is not a jurisdictional limitation but instead is a rule which may be abrogated in our sound discretion. Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 360 (11th Cir.1984). Nonetheless, this is not a case ... where "substantial justice" calls for the rule's abrogation.
 
 
 59
 A review of the record indicates that the defendants at no time requested the district court to hold the hearing it now asks this court to order. Nor did the defendants argue that the notice they received was improper. Thus, unless "substantial justice" is at stake, we should not review these claims for the first time on appeal.
 
 
 60
 It seems beyond argument that substantial justice is not implicated by these claims. Initially, I note that the issues involved in this appeal arose in a case involving a jail operated by the defendants where the conditions have, since 1974, violated the eighth and fourteenth amendments of the constitution. Of course, defendants accused of conduct amounting to contempt are entitled to the protection afforded by the due process clause of the fifth amendment. Nevertheless, to say that substantial justice is implicated in this case stretches the concept beyond its limits. Upon considering the nature of the alleged procedural failures, one has to conclude that substantial justice is not implicated in this case.
 
 
 61
 First, assuming that a show cause order was required in this case, the defendants have not presented any evidence or argument suggesting that they were prejudiced by the failure to issue the order. In this case, the plaintiffs made a motion for sanctions asking that the court "find that the defendants are in contempt of court." R2-190. The defendants filed responses to these motions which were considered by the district court. The response indicates that the defendants had actual knowledge that the plaintiffs were seeking contempt. See R2-193 (admitting that order was violated and offering their efforts to comply as an excuse to avoid contempt). In addition, by this time the court had previously found the defendants in contempt for one of the defendants' other violations of the inmate cap. Thus, the defendants have no claim that they could not anticipate that their current conduct would lead to another finding of contempt.[4] Absent a claim that the defendants were unaware that the court was contemplating a contempt finding, substantial justice does not require us to consider this claim.
 
 
 62
 Similarly, assuming that the defendants were entitled to a hearing before the challenged orders were entered, such a failure did not result in a substantially unjust result. This conclusion is evident from the defendants' conduct at the time. Unlike other subtle legal claims, the lack of injustice stemming from a failure to hold a hearing is immediately apparent. The fact that the defendants did not in any way complain about this failure is almost conclusive evidence that they were not harmed. In addition, the defendants have not presented this court with any arguments that they could have presented at a hearing that they were unable to present in their motions. In fact, all the arguments relating to the merits of the contempt orders were actually presented either in their response filed opposing a contempt finding or in their motion seeking reconsideration of the contempt finding. Similarly, no disputed issues of fact have been shown. Under these circumstances, substantial justice does not require us to consider this argument.[5]
 
 
 63
 A decision not to consider the defendants' argument that a hearing is required is especially appropriate in this case. Not only did the defendants fail to comply with this court's established requirement that a party raise objections to district court actions in that court before bringing them on appeal, in this case the applicable local court rules anticipate that a hearing will not be held unless requested by a party. The local rules for the U.S. District Court for the Southern District of Georgia provide:
 
 
 64
 Motions shall generally be determined upon the motion and supporting documents filed as prescribed herein. However, the assigned judge may allow oral argument sua sponte, or upon written request of either party made at the time of the filing of the motions. Requests for oral argument shall estimate the time required for argument.
 
 
 65
 Id. at Rule 6.3.
 
 
 66
 The requirement that a party present arguments in district court before raising them on appeal serves the important goal of orderly judicial administration. If the defendants could show that a hearing needed to be held in this case, I am confident that Judge Edenfield would have held one. The rule encourages an efficient use of both the parties and the courts' resources by avoiding needless appeals. The policies favoring application of the waiver rule are served in this case. The policies favoring substantial justice exception are not. As the court said in First Alabama:
 
 
 67
 The case law in this area indicates that we hear issues otherwise waived only in instances where strict application of the rule would result in patently unjust results. This does not mean, however, ... that we will entertain all issues first raised on appeal whenever they are outcome determinative. This approach would swallow our general rule of waiver, further impeding the efficient administration of justice.
 
 
 68
 899 F.2d at 1060 n. 8. For these reasons, I would not consider the defendants due process claims.
 
 B. Due Process and Contempt Proceedings
 
 69
 Even if I were to "[f]orgive the ... shabby procedural pedigree" of the due process arguments raised by the defendants, I would reject the defendants' claims because they "have no legal basis." First Alabama, supra. The defendants request this court to apply an inflexible approach to due process that is inconsistent with established due process jurisprudence. That the defendants make such a request is not surprising as they are facing a $30,000 sanction. What is surprising is that the majority accedes to their request.
 
 
 70
 I start by noting that it is both an elementary and established principle that the requirements of due process vary with the circumstances surrounding the government's actions. The Supreme Court has made this abundantly clear:
 
 
 71
 [This Court's prior] decisions underscore the truism that due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protection as the particular situation demands. Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected.
 
 
 72
 Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976) (citations and internal quotation marks omitted). This court has recognized that this flexible, balancing approach is an appropriate test to use when determining the procedural prerequisites to a finding of summary criminal contempt:
 
 
 73
 Supreme Court decisions regarding the proper scope of summary contempt authority have been based upon a balancing of values. When the issue has arisen, the Court has weighed the specific due process right implicated in the circumstances of the case against the accepted justifications for summary contempt proceedings. Should the value of process weigh more heavily than the need for summary procedures, the Court has moved to protect accused contemnor and to correspondingly limit the contempt power. Should the value of process weigh less heavily in the circumstances of the case, the Court has refused to place additional limitations on contempt authority.
 
 
 74
 Sandstrom v. Butterworth, 738 F.2d 1200, 1209 (11th Cir.1984), cert. denied, 469 U.S. 1109, 105 S.Ct. 787, 83 L.Ed.2d 781 (1985); see also Sassower v. Sheriff of Westchester County, 824 F.2d 184, 189 (2d Cir.1987) (applying Mathews v. Eldridge to determine procedures required by due process in case of summary criminal contempt). While the procedures that must be followed before summarily finding a defendant guilty of criminal contempt differ from those required in a civil contempt case, the balancing approach of Mathews v. Eldridge and Sandstrom v. Butterworth should be used to determine the required due process.
 
 
 75
 The majority opinion totally abandons this teaching. Although the majority notes that its "model" of the civil contempt process is "by no means [the] exclusive" manner by which civil contempt is imposed, see Maj.Op. at 767, the opinion explicitly judges the procedures used by the district court through the inflexible requirements of its typical model. Such an approach can hardly be consistent with the flexible approach mandated by the Court and implicit in the due process clause.
 
 
 76
 In this case, the majority interprets due process to require:
 
 
 77
 When purportedly contumacious conduct occurs outside the presence of the court, due process requires that the defendant (1) be informed, through a show cause order, of his purportedly contumacious conduct, and (2) be given a hearing at which he can be represented by counsel, call witnesses, and testify in order to show cause why he should not be held in contempt.
 
 
 78
 Maj.Op. at 766-67. (footnotes omitted). The majority's holding is based on two of Supreme Court decisions involving criminal contempt--In re Oliver, 333 U.S. 257, 275, 68 S.Ct. 499, 508, 92 L.Ed. 682 (1948) and Cooke v. United States, 267 U.S. 517, 537, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925) and dicta in two of this circuit's cases--In re Birmingham Reverse Discrimination Litigation, 833 F.2d 1492 (11th Cir.1987), aff'd, --- U.S. ----, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), and Newman v. Alabama, supra. None of these cases support the majority's holding that due process requires a show cause order and a hearing.
 
 
 79
 First, it is well established that the requirements of due process are greater in the case of an adjudication of criminal contempt. See United States v. United Mine Workers of America, 330 U.S. 258, 298-99, 67 S.Ct. 677, 698-99, 91 L.Ed. 884 (1947) (contemptors not prejudiced by simultaneous civil and criminal contempt proceeding when additional procedural requirements for criminal contempt followed). The majority offers no support for their implicit conclusion that the procedures noted in Cooke and Oliver are always required in a civil contempt case. While I agree that due process requires some type of notice and some type of opportunity to respond in a civil contempt case, I reject the idea that the understandably more rigid requirements in criminal cases, which are inconsistent with the nature of a civil action, are required before a finding of civil contempt can be made.
 
 
 80
 Similarly, the holdings of the two cases from our court fail to support the majority's argument. In those cases, the court held that the remedy of contempt should have been used rather than the actions actually taken. See Birmingham Reverse Discrimination Litigation, 833 F.2d at 1501 (U.S. could not intervene in litigation initiated by white firefighters who were not parties to previous litigation since U.S. was a party to that litigation; rather, U.S. should seek a show cause order or move to have previous decree modified); Newman v. Alabama, 683 F.2d at 1318-19 (order directing prisoners to be released abuse of discretion when plaintiffs did not seek to hold defendants in contempt; relief became new injunctive order beyond the scope of the consent decree and beyond the scope of the proven constitutional violation). While the opinions describe "typical" contempt proceedings, neither of these cases even hint at the procedural requirements the due process clause would impose in such a proceeding.
 
 Show Cause Order
 
 81
 The majority first faults the district court for not issuing a show cause order to the defendants. The defendants, however, had actual notice that contempt was contemplated and actually responded to the plaintiffs' motion for sanctions. The function of the show cause order is to provide the defendants with notice that the court is considering contempt because the defendant has acted in a manner inconsistent with one of the court's orders. The plaintiffs' motion asked the court to find the defendant in contempt. The defendants have not argued that they were not aware that the motion would result in the court considering a contempt sanction. Nor could they credibly make such an argument given the motion itself and the court's previous warnings to the defendants.
 
 
 82
 It is simply not the law that a person cannot be held in contempt unless the court issues a show cause order. Contempt sanctions have been affirmed in the absence of such an order. In CFTC v. Premex, 655 F.2d 779, 782 n. 2 (7th Cir.1981), the plaintiff moved the court to issue a show cause order. The court, after considering materials previously filed, entered an order finding defendant in contempt without issuing a show cause order. The seventh circuit affirmed the contempt finding noting that the defendant received the motion and the supporting papers in ample time to prepare a response to the motion. Id. at 782 n. 2.
 
 
 83
 Similarly, in United States v. City of Yonkers, 856 F.2d 444, 452-53 (2d Cir.1988), rev'd on other grounds, --- U.S. ----, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990), the district court, after warning the defendants on two prior occasions that further disobedience of the court's orders in a housing discrimination case would result in a finding of contempt, entered an order noting that further noncompliance with the court's orders would result in specified fines for noncompliance. After the city council voted against the adoption of the remedies required by the district court's order, the court held the defendants in contempt. The defendants challenged this finding in part because of the district court's failure to issue a show cause order. The second circuit rejected this claim holding that the previous order setting the fines for noncompliance "served as a show cause order giving the council members notice that in the event of a failure to comply with the requirements of that order" a contempt adjudication would occur. 856 F.2d at 452-53.
 
 
 84
 In this case, the court issued a similar order on February 24, 1988 which warned the defendants that future violations of the cap would result in sanctions.[6] Consistent with this order, the court in November 1988 found the defendants in contempt and imposed a $400 sanction. The second circuit's reasoning in Yonkers that a previous order warning the defendants that future disobedience would result in a contempt finding was a sufficient show cause order in this case is especially appropriate as the instant appeal is from the second finding of contempt. Not only were the defendants warned by the February 24, 1988 order that contempt was being contemplated, the court demonstrated it was serious about the warning when it found the defendants in contempt in November 1988. The February 6, 1989 response and brief filed by defendants after the plaintiffs filed their fifth motion for contempt demonstrates that the defendants knew they were in jeopardy of a contempt sanction. That this notice was sufficient to give the defendants an adequate opportunity to respond is evident from the brief and response which detailed facts and legal arguments for excusing the defendants' noncompliance. Given the circumstances of this case, a show cause order was not required.
 
 Hearing Requirement
 
 85
 The majority also concludes that the contempt proceedings were invalid because the district court failed to hold a hearing before finding the defendants in contempt. Again the majority finds that a hearing is an inflexible requirement in a contempt case. The majority does not cite a single case that supports such a broad entitlement for a hearing. Based upon the cases actually addressing this issue, a hearing was not required in this case.
 
 
 86
 The defendants have not presented this court with any arguments or facts that were not presented to the district court. The defendants' argument that they took immediate actions to reduce the population was addressed by the district court and rejected in the February 7, 1989 order. The defendants raised the arguments in their response to the motion for sanctions. The legal issues concerning this argument previously had been presented in the defendants' responses to the other motions for sanctions and during the oral argument on these motion as well as in the brief filed February 6, 1989.
 
 
 87
 Additional facts concerning the defendants' efforts were before the court in the form of several letters from the sheriff to the court reporting the fact that the jail was exceeding the population. At oral argument in this court the defendants argued that the extraordinary efforts taken by the commission on February 10, 1989 were not before the court at the time the sanctions were imposed. The speciousness of this argument is demonstrated by the fact that these actions occurred after the February 7, 1989 order finding the defendants in contempt. The district court correctly found that these actions were taken after the defendants were found in contempt and because of the sanction.[7] R2-105 at 8. Thus, at hearing on the contempt motion, the defendants could not have presented these efforts because they had not been taken nor would they have been taken absent the contempt finding.[8] The plaintiffs do not dispute any of the facts serving as a basis for the impossibility defense. Rather, they have consistently argued that these facts do not excuse the defendants' noncompliance. The defendants' and the majority's contention that due process requires an opportunity to orally present legal and factual arguments that were either undisputed or before the court at the time of its decision lacks any basis in common sense. This explains why the majority opinion lacks any legal authority to support its position in the context of a civil contempt case.
 
 
 88
 Several courts have addressed the question of whether a hearing is required before a contempt sanction is imposed. Dicta in several opinions does superficially support the majority's conclusion. In N.L.R.B. v. Cincinnati Bronze, Inc., 829 F.2d 585 (6th Cir.1987), the court noted that an alleged contemptor is entitled to "an impartial hearing with an opportunity to present a defense." Id. at 589 (emphasis added). The court in that case rejected the contemptor's argument that the oral hearing was not before an impartial decision-maker. Id. at 590. The court did not discuss the issue of what type of proceeding was necessary to constitute a hearing. Similarly, in Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union, 531 F.2d 617, 620 (D.C.Cir.1976), the court noted that a "full" hearing is required anytime a "civil contemptor ... asserts a genuine issue of material fact." Of course, this holding is explicitly limited to cases where there are factual disputes.
 
 
 89
 Other cases directly addressing the defendants' argument have rejected the argument that due process requires such a hearing. In Premex, the seventh circuit noted:
 
 
 90
 Premex and Zack seem to imply that the district court erred in denying them an evidentiary hearing in the contempt proceeding. However, the refusal to grant a full evidentiary hearing did not constitute a due process denial where the documentary evidence presented by the CFTC was more than sufficient to establish the contemptuous conduct. In addition, defendants received the CFTC's motion and supporting papers in ample time to prepare for a show cause hearing. They also failed to demand such a hearing at that time and did not present any arguments which created any material issue of fact. Unlike the situation in United States v. Alter, 482 F.2d 1016, 1023-24 (9th Cir.1973), Premex was not deprived of a meaningful opportunity to present its defense. Defendants merely failed to take advantage of the chance they were afforded in the court below.
 
 
 91
 655 F.2d at 782, n. 2. Similarly, in the context of a prison conditions case where the defendants had raised the same defense to the contempt finding as the defendant did in this case, another court held:
 
 
 92
 The Commonwealth argues that the court issued its August order without the prior hearing that the law requires. See Washington Metro Area Transit Auth. v. Amalgamated Transit Union, Nat. Capital Local Div. 689, 531 F.2d 617, 620 (D.C.Cir.1976) (civil contemnors who assert a genuine issue of material fact have a right to a full, impartial hearing); Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook R.R. Co., 380 F.2d 570, 578 (D.C.Cir.) (same), cert. denied, 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560 (1967). We have held before, in analogous circumstances, that in certain settings a matter can adequately be heard on the papers if given the nature and circumstances of the case the parties had a fair opportunity to present relevant facts and arguments to the court, and to counter the opponent's submissions. Aoude v. Mobil Oil Corp., 862 F.2d 890, 894 (1st Cir.1988) (citation omitted) (discussing necessity for hearing on preliminary injunction). This case passes [this] test. The Commonwealth had adequate notice and an opportunity to present evidence and arguments in writing. The Commonwealth points to no disputed factual matters that required an oral proceeding. Nor does it claim that it asked the court for such a hearing. Thus we can find no violation of any legal right.
 
 
 93
 Morales-Filiciano v. Parole Board of the Commonwealth of Puerto Rico, 887 F.2d 1, 6-7 (1st Cir.1989) (internal quotations omitted) (emphasis in original). These cases are indistinguishable from the case at hand. The defendants had notice that the plaintiffs were seeking contempt. They filed responses opposing the motion. They did not raise a disputed issue of fact, ask for a hearing, or request an opportunity to present oral argument. Under these circumstances, the failure to hold a hearing is not a violation of due process.
 
 
 94
 Other cases directly addressing the need for an evidentiary hearing before a finding of civil contempt have come to similar conclusions. See, e.g., In re Grand Jury Proceedings, 795 F.2d 226, 234-35 (1st Cir.1986) (court affirmed refusal to hold evidentiary hearing when contemptor sought to produce evidence that would have been "repetitive" given the written record in the case; noting that hearings are required when "controverted factual issues lie at the heart of the contempt"), cert. denied, 479 U.S. 1064, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987); International Business Machines v. United States, 493 F.2d 112, 119-20 (2d Cir.1973) (no due process violation for failure to hold evidentiary hearing when contemptor admitted that it failed to comply with the order when it had the power to do so), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); New York State National Organization for Women v. Terry, 732 F.Supp. 388 (S.D.N.Y.1990) (no hearing required for alleged contemptors who did not dispute facts alleged by movants); see also Parker Pen Co. v. Greenglass, 206 F.Supp. 796, 797 (S.D.N.Y.1962) ("These defenses are insufficient. The terms of the injunction are clear.... There seems to be no fact in dispute. A hearing is unnecessary."). Notably, in IBM, supra, the court approved (over a due process challenge) a local rule providing that an alleged contemptor may receive an evidentiary hearing only if the "alleged contemptor puts in issue his alleged misconduct." 493 F.2d at 112.
 
 
 95
 If the defendants and the majority contend that due process always requires the opportunity to present oral argument on legal issues, they advocate an unprecedented extension of the fifth amendment. This argument was implicitly rejected in Premex, and explicitly rejected in Morales-Filiciano.
 
 
 96
 The majority argues that a hearing was necessary to allow the defendants an opportunity to move for a modification of the order. The majority, in its description of a typical contempt proceeding, does not explain why it is necessary to hold a hearing to receive such a motion. That a hearing is unnecessary is evident by the facts of this case. The defendants filed a motion to modify the cap after the February 7th order found them in contempt. They could have filed such a motion when they filed their response to the plaintiff's motion.
 
 
 97
 The majority's suggestion that the court would have granted a motion to modify the cap at a show cause hearing is based on pure speculation. The defendants had attended other contempt hearings after failing to comply with the cap and made no such motion. It is unclear whether the court would have granted such a motion at that time. The record indicates that the plaintiffs consented to the modest February 10th modification after the defendants agreed to accelerate the completion of the new facility. Previously the plaintiffs had responded to the defendants' violations of the cap by moving for sanctions. The plaintiffs' consent seemed important to Judge Edenfield as he asked the plaintiffs' attorney if he consented to the modifications three separate times. R5 at 3-5. In addition, the court approved the modifications after the defendants agreed to take measures to assure that the jail had sufficient staff and beds to handle the extra weekend prisoners. See R5 at 3, 6. A hearing was not necessary to show that circumstances had changed because the defendants did not argue that circumstances had changed and because circumstances did not change until after the defendants were found in contempt.
 
 Conclusion
 
 98
 I have dissented because I cannot find that the district court committed any errors. I consider the majority's opinion to be a significant departure from prevailing law that governs contempt proceedings. To assist district judges, I will outline what Chief Judge Edenfield did in this case so they will know what is not sufficient.
 
 
 99
 On February 23, 1988, Judge Edenfield, after referring to the January 10, 1984 court order, commented that for a lengthy period the population count had exceeded the maximum allowed, including the deviation permitted by the court's previous order. The court then issued a show cause order requiring defendants to appear to give explanation or show cause why penalties should not be imposed. (Tab 179).
 
 
 100
 After a hearing, the court entered a four-page order which included the following: "For any portion of a day that prisoners exceeding the cap are in the jail, a fine of at least One Hundred Dollars per prisoner will be assessed against the County Commissioners, and will be paid into this court as a fine; not to be refunded to the county." (Tab 183).
 
 
 101
 On October 7, 1988, plaintiffs moved for imposition of sanctions. On October 14, the County responded and acknowledged the violation. To the response was attached a letter from Sheriff Mitchell which includes the following paragraph:
 
 
 102
 As a result of my commitment not to release felons, it is quite probable that this overcrowding problem will continue until such time as the Commissioners of Chatham County see fit to provide me with adequate housing for these individuals. Until that time I offer the following recommendations: I intend to make daily reports to the court to advise you of the daily count on any days when we exceed the maximum number of inmates imposed by the standing order of the court. In addition, I am directing the Chatham County Director of Finance, Mr. Persaud, to submit the one hundred dollar per day percapita fine for each inmate in excess of the court order into the registry of the court.
 
 
 103
 (Tab 187).
 
 
 104
 On November 9, 1988, following a hearing on the previous day, the court entered an order reciting that according to testimony presented by Sheriff Mitchell and Jailer Holmes, the prison population had exceeded the limit and directed that the "County Commission is fined $100.00 per inmate.... [A] total of $400.00 will be paid into this Court instanter, and will not be refunded to the County." (Tab 188).
 
 
 105
 On January 23, and February 6, 1989, Sheriff Mitchell wrote Judge Edenfield advising that the prison population was exceeding the limit imposed by the court order. (Tab 189).
 
 
 106
 Plaintiffs moved for sanctions on January 25, 1989. (Tab 190).
 
 
 107
 On February 1, defendants filed their response in paragraph 3 of which they admitted:
 
 
 108
 that the population count in the jail on January 21, 22 and 23, 1989, did exceed the population cap of 389 set by the court, but defendants took immediate action to reduce the population within the court ordered population cap, and that defendants did not willfully or intentionally violate the court's order of February 24, 1988.
 
 
 109
 (Tab 193).
 
 
 110
 On February 6, defendants filed their brief setting out the excessive number of felons being arrested and that a new facility was under construction, and argued that defendants were not willfully disobedient and that they were unable to comply with the court's order. (Tab 194).
 
 
 111
 Neither in their response nor their brief did defendants ask for a hearing.
 
 
 112
 In a three-page order filed February 7, 1989, the Court again fined the defendants, during the course of which the court referred to the fact that "[t]he parties and the Court are bound by the Constitution and by a duly entered consensual judicial order"; the number of prisoners has been steadily increasing since 1984; and "[t]he Sheriff has acknowledged the violation of the limitation and he offers excuses for not complying with the Order." The court in speaking of other options says, "For instance, the Sheriff acknowledges that bed space is sometimes available in the state system and that some prisoners have been transferred there to avoid exceeding the cap." (Tab 196).
 
 
 113
 On February 10, the court entered its order based upon the certification of the number of excesses and found that between January 21 and February 8, 1989 the court-imposed limit had been exceeded 153 times and imposed a fine of $200 per inmate for a total of $30,600. That order was filed at 10:47 AM on February 10. (Tab 198).
 
 
 114
 At 3:10 PM on February 10, the Sheriff (but not the county commissioners) moved for a modification of the order fixing the inmate limit to permit him to exceed the limit on weekends and certain emergencies for a period of 48 hours. The court the same day granted that motion so long as the limit did not exceed 419 prisoners.
 
 
 115
 On February 22, 1989, the County Commissioners filed a motion for reconsideration of the February 10 order imposing the fine in the amount of $30,600. There was no request for a hearing. The motion recites the following as paragraph 4:
 
 
 116
 The Chairman of the Chatham County Board of Commissioners called a special meeting, which was held on Thursday, February 9, 1989, at 2:00 p.m., to discuss alternatives to the jail population problem facing the Sheriff, and at its regularly scheduled meeting on Friday, February 10, 1989, took action to expend upwards of an additional $175,000.00 to speed up the building of a new Chatham County jail facility, which was already under construction.
 
 
 117
 (Tab 201).
 
 
 118
 The motion requests the court to vacate its order of February 10 because of defendants good faith in dealing with the jail problem or alternatively permitting the fine to be applied to the costs of the new jail.
 
 
 119
 The majority reverses on a due process argument on the ground the court did not issue a show cause order and conduct a hearing before entering the February 7 order levying a fine against the defendants for violating the 1984 order. This is despite the fact that defendants did not ask for a hearing and despite the admission in the response and the Sheriff's letters that the limit had been exceeded. In note 7, the majority states that the County brought its due process argument to the attention of the court with its February 22 motion for reconsideration of the February 10 order which was merely the fixing of the total amount of the fine by multiplying the $200 by the number of violations. I do not find any due process argument in the February 22 motion, but if I did I would think it a bit late.
 
 
 120
 I am convinced the district court committed no error, procedurally or substantively, and its judgment should be affirmed. I attach a copy of the court's March 10, 1989 order denying defendants' motion for reconsideration to illustrate the soundness of the district court's reasoning in finding that had it not imposed the $30,600 fine the commissioners never would have acted. I commend the district judge for his patient handling of this difficult task. I find that the defendants received every legal right to which they were entitled.
 
 APPENDIX
 EDENFIELD, District Judge:
 ORDER
 
 121
 Chatham County has moved for the Court to reconsider its February 10th Order fining defendants $30,600. This fine was computed based on the Court's Order of February 7, 1989, that increased the fine from $100 to $200 per day for every inmate housed in excess of the jail population cap. James Bass, counsel for plaintiffs, consulted with defendants and certified to the Court that between November 9, 1988 and February 8, 1989, the jail population exceeded the cap by a total of 153 inmates. Defendants' motion to reconsider is DENIED.
 
 BACKGROUND
 
 122
 The problem of overcrowding in the Chatham County Jail is not of recent origin. The dilemma persists notwithstanding agreements ratified by the Court, interim agreements, the appointment of monitors, the advice of jail experts, informal conferences, full evidentiary hearings, and a "final settlement" agreement covering various aspects of jail conditions. Indeed, this case began over a decade ago when, in 1974, a group of inmates filed a class action under 42 U.S.C. Sec. 1983. The inmates challenged the conditions of the jail, claiming that the conditions of the jail violated the United States Constitution. At the time the litigation began, the inmates were housed at the Habersham Street Jail where, the defendants conceded, "atrocious conditions prevailed." Order of January 14, 1983, p. 1.
 
 
 123
 The County responded with proposals for erecting the Chatham County Jail. The litigation abated because the plaintiffs hoped the new jail would provide an answer to their grievances. Unfortunately, however, the new jail was plagued by new problems as well as by many of the same problems that plagued the Habersham Street Jail.
 
 
 124
 The new jail fell short of meeting the standards of the United States Constitution. Specifically, the eighth amendment of the Constitution protects convicted criminals from cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97 [97 S.Ct. 285, 50 L.Ed.2d 251] (1976). In addition, the due process clause extends to pre-trial detainees and protects them from punishment before they are adjudged guilty of a crime. See Bell v. Wolfish, 441 U.S. 520 [99 S.Ct. 1861, 60 L.Ed.2d 447] (1979). Jail overcrowding may violate the inmates' constitutional rights, and, in response, courts may order the population level to be held to an acceptable level. See Jones v. Diamond, 636 F.2d 1364, 1376 (5th Cir.1981).[1]
 
 
 125
 Upon realizing the deficiencies of the new jail, the plaintiffs returned to this Court, requesting the defendants to bring the jail into compliance with constitutional standards. In 1981, the Court issued several Orders addressing the constitutional deficiencies of the jail conditions. On February 27, 1981, the Court entered a Consent Order that ratified an agreement between the parties setting forth standards regarding medical and dental care, recreation, staffing, and management operations. In July of 1981, the Court entered an Order designed to assure inmates meaningful access to the courts. The Order was based on an approximate average of 380 inmates.
 
 
 126
 Despite these mandates, the deficiencies persisted. In November 1981, the Court noted that defendants had failed to comply with the February 27th Consent Order. The jail was overcrowded, with an inmate population of approximately 450. The Court decreed that the jail population could not exceed certain limits without prior approval.[2] Although the "facts supported a finding of contempt," the Court refrained from holding defendants in contempt and offered them an opportunity to bring the jail into compliance with the terms of the Consent Order and the other prior Orders. Order of November 19, 1981, p. 2.
 
 
 127
 Shortly thereafter, the problem of overcrowding resurfaced. The newly constructed Chatham County Jail was described as "severely limited" in its space available for the housing of inmates and for administrative functions. Order of January 14, 1983, p. 2. It was determined that the jail's design capacity allowed for 381 inmates. The "manageable" population level, however, was even lower and was believed to be around 330 to 350. Order of November 19, 1981, p. 4. The Court underscores the fact that although the cap places restrictions on the jail population, the current cap of 389 surpasses what is agreed to be the "manageable" level by 39-59 inmates.
 
 
 128
 The Court found that overcrowding prohibited the successful implementation of inmate classification procedures and programs that would contribute to a decrease in jail violence. The Court called for the eradication of overcrowding in the Chatham County Jail. The Court acknowledged that this problem could not be solved overnight and that a long-term solution would require funds over which the taxpayers exercised ultimate control. As early as January of 1983, however, the Court warned the defendants that political pressures and monetary barriers could not "justify continued violation of constitutional rights." Order of January 14, 1983, p. 8.
 
 
 129
 The Court appointed Dr. Robin Ford to act as a temporary special master and to recommend remedial measures. To ascertain the extent of the overcrowding problem, the Inmate Daily Census reports were initiated. The reports revealed that the jail experienced "severe overcrowding" from the spring of 1981 through June, 1983. Order of January 10, 1984, p. 3. The inmate population "not only exceeded a 'manageable' level, but surpassed the prison's design capacity." Order of January 10, 1984, p. 3. During this time, the Court found that overcrowding caused violations of the inmates' constitutional rights. Order of January 10, 1984, p. 3.
 
 
 130
 Based on Dr. Ford's recommendations and on the unabated history of substandard conditions, the Court addressed the issue of overcrowding. The Court lowered the cap to 381: "[b]ecause of the patent defects at the Chatham County jail and the inability of the Sheriff to meet the demands of the Consent Order and other Orders of this Court when the Jail is severely overcrowded, the Court lowers the cap on the inmate population from 446 to 381, the maximum design capacity at the Chatham County jail." Order of January 10, 1984, p. 10. The cap was later increased to 389 to reflect design modifications that increased the inmate capacity to accommodate eight more inmates. Order of February 24, 1988, p. 3.
 
 
 131
 As the above summary demonstrates, it should have been plain to all parties involved that the Chatham County Jail was deficient and that the overcrowding problem required the defendants' immediate attention as well as action. The county had an acute need to increase its inmate housing capacity; the number of criminals and pre-trial detainees that needed to be incarcerated was not likely to decrease, so the only alternative was to find additional space. In spite of this obvious need, no immediate action ensued.
 
 
 132
 On several previous occasions, defendants violated the Court's Order by exceeding the inmate population cap. Most recently, the Court entered an Order on November 9, 1988, setting a fine of $100 per day for each inmate held above the cap. Clearly then, these violations are not a new phenomenon.
 
 
 133
 The Order of November 9th did not make a long-lasting impression on the defendants. Shortly thereafter, the inmate population again exceeded the cap. Between January 21, 1989 and February 8, 1989, the inmate population exceeded the cap fourteen times. On January 25, 1989, plaintiffs reported to the Court that the jail population had exceeded the cap and plaintiffs moved for sanctions. On February 7, 1989, the Court entered an Order modifying its November 9th Order; the Court declared that it would impose a fine of $200 for every reported violation of its past Orders.
 
 
 134
 Plaintiffs met with defendants and they certified to the Court that between January 21 and February 8 the jail population exceeded the cap by a total of 153 inmates. On the morning of February 10th, the Court entered the $30,600 fine.[3] Later that same day, the parties met and agreed to a temporary relief measure that would allow the jail population to temporarily exceed the cap by 30 inmates on weekends and in emergency situations. The Court promptly ratified this agreement and entered an Order binding the parties to this agreement.
 
 ANALYSIS
 
 135
 It is abundantly clear to the Court, if to no one else, that inadequate jail space for this county has a long and undistinguished history. The Court is aware that jail overcrowding is not unique to Chatham County, and not everyone is eager to find a solution to the overcrowding problem: some people are reluctant to expend the money necessary to provide a solution to this problem; some people urge the criminal justice system to treat the inmates like "cord wood," unworthy of even such basic care as protecting non-violent criminals from violent criminals and separating pre-trial detainees from convicted criminals. But the Court must heed the federal laws of this country, and those laws require that jailers offer prisoners some degree of protection from brutality and insure for the prisoners minimal standards of health, housing and food.
 
 
 136
 As is evidenced from the above discussion, the overcrowding problem did not arise overnight, and the Court has not ambushed defendants with unexpected demands. Many of the terms of the Order under which the parties are operating were agreed to by defendants. Order of February 27, 1981. Furthermore, defendants received ample notice that any deviations from the cap would induce sanctions. Defendants have had years to find a solution and to learn how to cope with the problem. They failed to do so and the Court's patience is exhausted. Defendants are bound by their previous agreements and by the Court's past Orders.
 
 
 137
 In support of their motion for reconsideration, defendants claim that the sheriff met with various county officials to undertake "extraordinary measures." These extraordinary measures, none of which involved releasing felons onto the street, reduced the inmate population below the cap. Defendants transferred some inmates to neighboring facilities. In addition, defendants report to the Court that on February 10, 1989, the Chatham County Board of Commissioners voted to spend $175,000 in order to accelerate the completion of a new jail facility that is hoped to relieve overcrowding. These actions demonstrate that defendants are indeed capable of complying with the Court's Orders. See U.S. v. Rylander, 460 U.S. 752, 757 [103 S.Ct. 1548, 1552, 75 L.Ed.2d 521] (1983) (Inability to comply with a court order is a complete defense to contempt sanctions).
 
 
 138
 What defendants fail to point out is that the "extraordinary measures" were taken in the wake of the Court's February 7th Order that increased the sanctions to $200 per inmate exceeding the cap. In its February 7th Order, the Court explained that fines were a "vehicle to encourage compliance." The fines worked; they served as a catalyst towards immediate actions to decrease the inmate population and advance the comletion date of the new jail. However, it is a sad commentary that the problem had to be addressed in this manner.
 
 
 139
 Defendants request the Court to suspend the fine because of the "good faith and diligence" that they have demonstrated. Defendants have repeatedly violated the Court's Orders over the last several years. Even if the Court found that defendants had acted in good faith, defendants cannot rely on good faith as an "excuse for [not complying]" with a court's orders. Newman v. Alabama, 683 F.2d 1312, 1318 n. 16 (11th Cir.1982).[4]
 
 
 140
 Neither does the Court find that defendants responded diligently when they learned of the violations. Plaintiffs filed a motion for sanctions on January 25, 1989. Defendants responded by filing a motion in opposition. It was not until after February 7, 1989, when the Court entered an Order fining defendants for noncompliance, that defendants took actions bringing the jail into compliance with the Court's Orders. Had defendants taken these actions immediately following the filing of plaintiffs' motion or in lieu of filing a motion in opposition, the Court might have found that defendants responded diligently. Considering the sequence of events, however, the Court does not find that defendants acted with "reasonable diligence." Powell v. Ward, 643 F.2d 924, 931 (2d Cir.1981) (One who acts in reasonable diligence cannot be found in civil contempt).
 
 
 141
 The Court fervently hopes that defendants do not violate this Court's Orders in the future. The power to avoid future violations rests with the sheriff and with the county officials. If, however, future violations do occur, the Court may assess personal penalties against the county officials.
 
 
 142
 Compliance with a court's orders is not discretionary. Rather, compliance is mandatory. This case is no exception. The Court would expect that defendants would respect its Orders as well as constitutional mandates and that fines would be unnecessary. If, however, defendants continue to ignore the Court's Orders, the Court stands ready to impose whatever fines and take all necessary action to insure compliance with constitutional standards, agreements and decrees.
 
 CONCLUSION
 
 143
 For the foregoing reasons, the defendants' motion to reconsider is DENIED. The fine stands at $30,600.
 
 
 
 [1]
 The appellants in this case are: the Sheriff of Chatham County, Georgia, the Chief Jailor of the Chatham County Jail, and the commissioners of Chatham County. For the sake of simplicity, we refer to the appellants collectively as the County
 
 
 [2]
 If the conduct occurs in the court's presence, it is direct contempt, while if the conduct appears outside the court's presence, it is indirect contempt. We are dealing here with purportedly indirect contempt
 
 
 [3]
 See infra note 11
 
 
 [4]
 Of course, any party can violate a court order and be held in contempt. In this opinion, we use the term "plaintiff" to represent the party seeking to enforce the court order and "defendant" to represent the party that has allegedly violated the court order
 
 
 [5]
 The show-cause order has been a required element of civil contempt proceedings since Blackstone's time. See W. Blackstone, Commentaries * 286-87
 
 
 [6]
 The dissent asserts that we are testing the district court's procedure in this case against our model of a typical civil contempt proceeding. To the contrary, we use our model only as an illustration of a proceeding that would always satisfy due process requirements; but we judge the district court's conduct only with the bare requirements of due process in mind
 
 
 [7]
 The dissent maintains that the County never presented its due process argument to the district court and, therefore, that we may not address the due process argument on appeal. The dissent states the rule correctly: we "generally will not consider a legal issue or theory unless it was presented to the trial court." Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 360 (11th Cir.1984). The dissent, however, proceeds to misapply the rule to this case. This misapplication is the result of the dissent's fundamental misunderstanding of how a civil contempt proceeding should be handled by the district court. When the plaintiff moves the court to order the defendant to show cause why he should not be held in contempt, the court, in most cases, must enter a show-cause order and conduct a hearing. Moreover, the court must take these procedural steps whether or not it is requested to do so by the defendant. Therefore, a court's error in failing to enter a show-cause order or conduct a hearing will not become apparent until the court has found the defendant to be in contempt and sanctioned him without following the requirements of due process. Therefore, a defendant has no reason to raise a due process argument until the error has occurred--after he has been sanctioned
 In this case, the County brought its due process argument to the court's attention in the brief supporting its motion to reconsider filed less than two weeks after the court imposed the $30,600 fine. Although it did not label the district court's error as a violation of "due process," it did assert that the district court should have conducted some type of hearing prior to imposing the fine. The County made the following argument in its brief:
 Furthermore, it is submitted that if [the court] had been aware at the time of entering the order of 10:47 a.m., on February 10, 1989, that the Chatham County Board of Commissioners was at the same time agreeing to expend an additional $175,000 to accelerate the construction of the new jail detention facility, perhaps [the court] would have been of the opinion that the Commission, in essence, had imposed a fine upon itself already and would not have imposed an additional fine of $30,600 upon the Commission and the taxpayers of this County.
 ... As in [Newman v. Graddick, 740 F.2d 1513, 1525 (11th Cir.1984) ], the newly-elected Chatham County Commission in the case presently before [the court] has acted not only diligently, but also responsibly to assist the Sheriff with the jail overcrowding problem. The Eleventh Circuit Court of Appeals in the Newman case reversed contempt orders issued by the trial court apparently because the trial court in Newman had not been aware that the Governor of Alabama and the Legislature met in special session at great expense to the taxpayers to enact special authority to assist the Department of Corrections in solving the overcrowding problem in Alabama.
 The facts before [the court] are very similar to the Newman v. Graddick situation in that [the court] issued an order on February 10, 1989, at 10:47 a.m., apparently unaware that the Board of Commissioners was acting simultaneously at the expense of the taxpayers to assist in alleviating the jail overcrowding problem.
 Thus, the County faced an order (of February 7) that at most said that the court was considering holding the County in contempt. The County Board of Commissioners acted to comply with the cap but apparently could not notify the court of its action before the court imposed the fine on February 10. The County then moved the court to reconsider its February 10 order, arguing that, had the court known of the Board's action, it might have acted differently. The County cited Newman, in which we agreed with the defendant's argument that the district court should have provided an "opportunity to be heard" on recent actions taken by the defendant to alleviate prison overcrowding. We reversed the order of contempt on that ground.
 While the County did not specifically tell the court that it had not satisfied the requirements of due process in imposing the fine, it did very clearly tell the court that it should have conducted a hearing on a material issue of fact. It did so in the extract from its brief quoted above by (1) asserting that it had acted with reasonable diligence to comply with the court's order, see infra note 11, (2) suggesting that the court might have acted differently had it been aware of the most recent developments, and (3) citing and discussing a case in which we held that the court erred in failing to conduct a hearing on the "reasonable diligence" issue prior to sanctioning a defendant. See Leonard v. Pan American World Airways, Inc., 905 F.2d 1457, 1462 (11th Cir.1990) (claim must be presented "in such a way as to afford the district court an opportunity to recognize and rule on it"); cf. Moreau v. Oppenheim, 663 F.2d 1300, 1307 (5th Cir.1981) (ambiguous allusion to legal theory plus more specific verbal reference sufficient to raise the theory in the district court), cert. denied, 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982); McLearn v. Cowen & Co., 660 F.2d 845, 849 (2d Cir.1981) (legal theory sufficiently raised in district court even though theory was incorrectly labeled, so long as sufficient to give notice of argument to opposing party and court).
 
 
 [8]
 The civil contempt power may be used for one of two reasons: "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses suffered." United States v. United Mine Workers, 330 U.S. 258, 303-04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). When circumstances have changed so that (1) noncompliance does not injure the complainant, or (2) there is no harm resulting from continued contumacious conduct, then, in most cases, it would be unjust to hold the defendant in contempt. See id. at 304, 67 S.Ct. at 701
 
 
 [9]
 Of course, the sanctions may not be any greater or more onerous than is necessary to ensure compliance
 
 
 [10]
 Our holding today in no way gives a party license to flout or wilfully to disobey a court order by violating the order and then complying with the order before the contempt proceeding begins. The court still will have two means of coercing compliance or punishing the defendant. First, the court may conclude that, even though the defendant is in technical compliance at the time of the proceeding, the defendant's prior conduct indicates that he will not continue to comply with the court's injunction. In such a case, it may be appropriate to hold the defendant in civil contempt and sanction him until he satisfies the court that he will indeed obey the injunction. Second, if the court finds the defendant acted wilfully or maliciously in disregarding the injunction, then the court may cite the defendant for criminal contempt. See United States v. Hilburn, 625 F.2d 1177, 1179 (5th Cir.1980). In such a case, the court may fully vindicate its authority with a fine, imprisonment, or both. Thus, in no situation is the court left without authority to act when the defendant appears to be flouting judicial authority. The record before us, however, contains no evidence of such conduct by the County
 
 
 [11]
 The dissent asserts that the requirements of due process in a civil contempt proceeding are flexible, varying with the circumstances of each case. We agree. For example, as the dissent notes, when there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt and sanctioning him. See Morales-Feliciano v. Parole Board, 887 F.2d 1, 6-7 (1st Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990). This principle, however, implies its converse. If the court is faced with a material issue of fact, then due process requires the court to conduct a hearing. See E.C. Ernst, Inc. v. Manhattan Constr. Co., 559 F.2d 268, 273 (5th Cir.1977), cert. denied, 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978)
 Consider again how the district court proceeded in this case. When the plaintiffs moved the court on January 25 to find the County in contempt and impose sanctions, the County filed a response in which it asserted that it had diligently attempted to comply with the court's order. We have held that when a person attempts with reasonable diligence to comply with a court's order, that person should not be held in contempt. See Newman v. Graddick, 740 F.2d 1513, 1525 (11th Cir.1984). Therefore, in its response, the County put into issue a material fact (in addition to the ever-present question whether circumstances had changed in a way that would make finding the defendant in contempt unjust). When the court entered its February 7 order stating that it would not consider any excuses presented by the County, it ignored two important questions: (1) whether the County had acted diligently and (2) whether circumstances had changed. Even if the court was convinced on February 6 that the County had not acted diligently or that circumstances had not changed, the court still had to consider those questions until the moment it entered its finding of contempt. Otherwise, the civil contempt sanction could not serve the purpose of coercing compliance. Therefore, the questions of diligence and changed circumstances were live and material when the court entered its February 7 order. Consequently, the court ignored the due process requirement that a hearing be conducted on all issues of material fact and imposed what amounted to a punitive, or criminal, contempt sanction on February 10.
 
 
 [1]
 At that time, there were 446 inmates in the jail. County jail officials later testified that the "manageable" number of inmates was between 330 and 350 inmates. See R1-120 at 4
 
 
 [2]
 The majority opinion characterizes these events as follows:
 The court conducted a hearing and imposed a fine $100 per day for each of the four prisoners held in excess of the cap. In its order of November 9, 1988, however, the court never found the county to be in contempt; it merely imposed a fine 'in accordance with' its order of February 24, 1988.
 Maj. Op. at 766. The majority emphasizes the fact that the court never "found" the county in contempt. The majority's literalistic reading of the November 9, 1988 order completely misses the reality of the events. The plaintiff asked for sanctions for contempt. The court ordered the county to pay $400 in response to this motion. In addition, even the defendants treated this order as a contempt finding. In their brief, they state that a "hearing on the plaintiffs' motion for contempt was held.... [and, thereafter,] the court entered an order granting the plaintiffs' motion." Appellant's Brief at 4. Finally, I note that the opinion omits the fact that this order is not at issue in this case--the defendants only appeal the 1989 contempt sanctions orders.
 
 
 [3]
 The defendants' contention that the court ignored their response, see Appellant's Brief at 10, is simply not true
 
 
 [4]
 In fact, Sheriff Mitchell wrote two letters to Judge Edenfield notifying him of violations of the cap. In the letters the sheriff noted that he was taking steps to see that the expected contempt sanctions would be paid
 
 
 [5]
 We note that the court held a hearing before the first finding of contempt which resulted in a $400 sanction. Thus, this is not a case where the request to hold a hearing might have been futile. The court gave absolutely no indication that it would have rejected a hearing request had the defendants shown a need for one. Nor is this a case where the defendants did not have an opportunity to request a hearing. The fact that the defendants had the opportunity to file a response in opposition to the contempt motion and motion for reconsideration of the sanctions establish that the defendants had opportunities to request a hearing. They could have done so at the time they filed the response to the motion
 
 
 [6]
 I agree with the majority's conclusion that the February 24, 1988 order was not a finding of contempt. That is not an issue in this case. The issue is whether defendants' were denied notice and an opportunity to show that their failure to comply was excusable. This order is significant because it shows that the defendants were aware that a contempt finding was being contemplated by the court
 
 
 [7]
 It is true that the final order setting the amount of the sanction had yet to be calculated and was entered the same day as the "extraordinary actions" were being taken. The amount of the sanction, however, was apparent to the defendants. The court had stated in the February 7, 1989 order that the sanction would be $200 for each inmate each day the cap was exceeded. The defendants were aware of the number of inmates. The defendants have not argued that they were in any way surprised at the amount of the sanction when the order was entered on February 10
 
 
 [8]
 In addition, as the district court pointed out, these actions establish that the defendants were able to comply with the court's order. That the defendants were able to comply with the court's orders cannot be seriously argued. The defendants were ordered to keep the prison population below the court ordered cap. Clearly, the defendants could have complied with the order by not admitting prisoners if doing so would cause the number of prisoners to exceed the cap. Similarly, the defendants could release prisoners. The defendants have not (nor could they) argue that these actions were impossible. Rather, the defendants seem to argue that to be placed in a position where they had to choose between complying with the court order or releasing prisoners was unreasonable. Assuming that argument is correct, the defendants should have appealed the underlying orders rather than disobey them. See Gompers v. Buck's Stove & Range, 221 U.S. 418, 451, 31 S.Ct. 492, 502, 55 L.Ed. 797 (1911)
 
 
 [1]
 The Fifth Circuit overruled that part of Jones that deals with fees of non-court-appointed expert witnesses. International Woodworkers of America v. Champion International Corporation, 790 F.2d 1174 (5th Cir.1986)
 
 
 [2]
 The Court decreed that the "jail population shall not be allowed to exceed the number which prevails at midnight on the date of this Order without prior approval of the Court." Order of November 18, 1981, p. 6
 
 
 [3]
 The Court arrived at this figure by multiplying the amount of $200 by 153, the number of inmates
 
 
 [4]
 In response to plaintiffs' motion for sanctions, defendants cite Newman v. Graddick, 740 F.2d 1513 (11th Cir.1984). Defendants claim that the facts of Newman are similar to the issues under consideration. Ironically, however, defendants fail to quote the following passage that the Court finds remarkably similar to the Mercer case:
 As to the release question, we note that the state officers consistently misstate the relief ordered. The court does not require mass release of prisoners from state custody. The order requires the release of prisoners from certain facilities that are so overcrowded as to make the retention of prisoners therein unconstitutional. In taking the prisoners from these facilities, the state is free to continue their confinement in any constitutional facility. If indeed the result of such a court order is the release of prisoners from state custody, that result is the fault of the state officers in not providing alternative constitutional housing for its prisoners. The misstatement of the federal court action is a disservice to the administration of justice.
 740 F.2d at 1521.
 Unlike the defendants in the Newman case, the defendants in the Mercer case never moved for a determination of the current constitutionality of the jail conditions. Furthermore, defendants have not set forth any evidence of changed circumstances that might merit a different finding.