Johnny REYNOLDS, et al., Plaintiffs,

v.

ALABAMA DEPARTMENT OF
TRANSPORTATION, et al.,
Defendants.

No. CIV. A. 85–T–665–N.

United States District Court,
M.D. Alabama,
Northern Division.

June 25, 1998.

Order Supplementing Opinion
July 8, 1998.

Robert L. Wiggins, Jr., Ann K. Wiggins, Russell W. Adams, Abigail P. van Alstyne, Kimberly C. Page, Scott Gilliland, and Kell A. Simon, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Johnny Reynolds, plaintiff, and Cecil Parker, Frank Reed, Ouida Maxwell, Martha Ann Boleware, Florence Belser, Peggy Vonsherie Allen, and Jeffrey W. Brown, intervenor-plaintiffs.

Claudia H. Pearson, Nakamura & Quinn, Birmingham, AL, for Robert Johnson, intervenor-plaintiff.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for William Adams, Cheryl Caine, Tim Colquitt, William Flowers, Wilson Folmar, George Kyser, Becky Pollard, Ronnie Pouncey, Terry Robinson, Tim Williams, intervenors.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for Michael Grant, John D'Arville, and Andrew McCullough, intervenors.

Thomas R. Elliott, Jr., Allen R. Trippeer, Jr., Lisa W. Borden, C. Dennis Hughes, London & Yancey, Birmingham, AL, and William H. Pryor, Jr., Attorney General for the State of Alabama, Montgomery, AL, for Alabama Department of Transportation, Alabama State Personnel Department, Jimmy Butts, in his official capacity as Director for the Alabama Department of Transportation, Halycon Vance Ballard, in her official capacity

as Director of the Alabama State Personnel Department, and Fob James, in his official capacity as Governor of the State of Alabama, defendants.

William P. Gray, Jr., Gray & Jauregui, Montgomery, AL, for Fob James, in his official capacity as Governor of the State of Alabama, defendant.

Elaine R. Jones, Norman J. Chachkin, NAACP Legal Defense Fund, New York, NY, for NAACP Legal Defense and Educational Fund, Inc., amicus.

Barbara R. Arnwine, Thomas J. Henderson, Richard T. Seymour, Teresa A. Ferrante, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for The Lawyers' Committee for Civil Rights under Law, amicus.

## CIVIL CONTEMPT ORDER

MYRON H. THOMPSON, District Judge.

This longstanding lawsuit—in which African–American plaintiffs charged the defendants, the Alabama Department of Transportation, the Alabama State Personnel Department, and their officials, with racial discrimination in employment—is once again before the court, this time on the plaintiffs' motion for civil contempt, filed June 16, 1998.[1] The plaintiffs charge that the defendants are in civil contempt of two orders entered by the court on May 8, 1998: the first order required, based on the recommendation of United States Magistrate Judge Susan Russ Walker, that the defendants convene a meeting of the counsel for the parties and their experts to develop a proposal for creating 'structured interviews' to be used in making 'provisional appointments';[2] and the second order required, again based on the recommendation Judge Walker, that the defendants convene a meeting of counsel and their experts to develop a proposal for creating 'screening' procedures to be used in making such appointments.[3] Because, as will be explained below, time was, and still is, of the essence, the court held a hearing on the contempt motion on June 22 and 23, 1998. Based on the evidence presented, the court now holds that the defendants are in civil contempt of the court as to both orders.

## I. BACKGROUND

Because the matter at issue centers on the defendants' alleged failure to hold simple meetings and develop basic proposals, an obvious initial question is why this failure, if true, warrants civil contempt proceedings, let alone a finding of civil contempt. A review of the background of this litigation and the facts of the instant dispute is necessary to explain why.

*May 21, 1985:* The nine plaintiffs in this lawsuit are Johnny Reynolds, Ouida Maxwell, Martha Ann Boleware, Florence Belser, Peggy Vonsherie Allen, Jeffrey Brown, Robert Johnson, Cecil Parker, and Frank Reed. Reynolds filed this lawsuit on May 21, 1985, and the other plaintiffs were allowed to intervene over the next seven years. They charged the defendants with widespread and long-lasting racial discrimination, and advanced claims based on theories of 'disparate treatment' and 'disparate impact.' The plaintiffs based this lawsuit on the following: Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17; the fourteenth amendment to the United States Constitution, as enforced by 42 U.S.C.A. § 1983; and 42 U.S.C.A. § 1981. The jurisdiction of the court has been invoked pursuant to 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 2000e–5(f)(3).

*March 16, 1994:* After a six-month partial trial in 1992, the parties reached a partial settlement, subsequently embodied in three

---

1. *See* plaintiffs' third motion for contempt, filed June 16, 1998 (Doc. no. 2825).

2. *See* order, entered May 8, 1998 (Doc. no. 2654).

3. *See* order, entered May 8, 1998 (Doc. no. 2659).

consent decrees. One of the consent decrees, commonly referred to as 'consent decree I,' was approved on this date.[4]

In short, consent decree I required that the Transportation and Personnel Departments establish, in a timely manner, new, non-discriminatory personnel procedures that would allow African–Americans and all other employees to compete for positions, openly and fairly, without regard to race. The decree provides detailed requirements regarding, among other things, recruitment (article I), training (article XVI), and the establishment of open and fair hiring and promotion procedures (articles II, III, IV, VI, VII, VIII, IX, X, and XIV). These requirements would, among other things, significantly restrict any opportunity for the Transportation Department to manipulate and circumvent personnel procedures in the future so as to avoid the hiring and promotion of African–Americans. As this court stated in an order entered on March 3, 1998, "Because *time was of the essence*—it was important not only to abolish immediately the Transportation Department's discriminatory procedures but also to establish new non-discriminatory ones with some urgency—the decree set time limits for compliance." *Reynolds v. Alabama Dep't of Transp.*, 996 F.Supp. 1130, 1137 (M.D.Ala. 1998) (emphasis added).[5] "In other words," the court continued, "the Transportation and Personnel Departments were required, within a certain period of time, to redress the past effects of their racially discriminatory policies and practices *and* to create and implement a personnel system that would be fair and open and that would restrict the two departments' opportunities to continue to discriminate against African–Americans." *Id.*

*1997:* Over three years after the entry of consent decree I, the employees of the Transportation Department, both black and white, were still without promotional procedures for either provisional (that is, temporary) or permanent appointments, and, as a result, promotions within the department had essentially ceased. In an order entered on July 15, 1997, the court explained that this scenario was hitting African–American employees the hardest: "African–Americans are still not only without open and fair procedures in which they may compete for positions based on their merit and without regard to race, they are being denied hiring and promotion opportunities altogether. The effect of the Departments' delay has been, for the most part, to shut down permanent hiring and promotions altogether, and thereby essentially punish the plaintiffs for vindicating their statutory and constitutional rights. And to make matters worse, the Departments have, and are continuing, to assign supervisory duties and responsibilities to employees, with the assignment often made outside the important strictures set up by the consent decree. While admittedly these assignments are without actual promotions, there is the possibility that those receiving the assignments will in future competition for jobs enjoy the credit and experience conferred on them by the assignments." *Reynolds v. Alabama Dep't of Transp.*, 972 F.Supp. 566, 568–69 (M.D.Ala.1997).[6]

The court described the situation as "grave." *Id.* at 570. The court said that, " 'The preceding scenario is intolerable and must not continue.' ... The time is now long overdue for the Transportation and Personnel Departments 'to take affirmative and substantial steps' to develop fair and open procedures for hiring and promotion.... Each additional day of delay only frustrates further the opportunities for those employees who have already waited far too long to compete in a non-discriminatory manner for positions in the Transportation Department." *Id.* at 569–70 (citations and footnote omitted).

---

**4.** *See Reynolds v. Alabama Dep't of Transp.*, 1994 WL 899259 (M.D.Ala. Mar.16, 1994) (Doc. no. 553). On January 23, 1998, the court entered an order adopting ¶ 4 of article XIII, which was part of consent decree II. *See Reynolds v. Alabama Dep't of Transp.*, 996 F.Supp. 1118 (M.D.Ala. 1998) (Doc. no. 2413). The remainder of consent decree II and all of consent decree III are still under submission with the court.

**5.** Doc. no. 2475.

**6.** Doc. no. 1985.

Indeed, in light of the crisis, the Adams intervenors, who represent white and other non-black employees, took the extraordinary step of requesting that the court appoint a monitor to oversee Personnel Department's compliance with its responsibilities under the decree. The intervenors "complained to the court that the Personnel Department was not complying in a timely manner with many of the provisions in the consent decree, and, in particular, with regard to the creation and implementation of a hiring and promotion scheme." *Id.* at 569.

*March 7, 1997:* It became apparent that a serious underlying cause in the delay in the development of promotion procedures was that "the parties have, without cause, failed to comply with the deadlines established in orders of this court."[7] In response, the court entered an order setting a $100–a–day minimum fine for "Any person who knowingly fails to comply with a deadline, or who knowingly causes a deadline not to be met."[8] "The term 'person' includes all attorneys, all defense experts, all plaintiffs' experts, and all parties."[9] The order was as follows:

"[I]t is ORDERED as follows:

(1) Unless extended by the court, all court-ordered deadlines are to be met. Agreements (formal or informal, and oral or written) between or among counsel for the parties to extend deadlines are not recognized.

(2) Any person who knowingly fails to comply with a deadline, or who knowingly causes a deadline not to be met, will be fined a *minimum* amount of $100 per day for each day of non-compliance. The term "person" includes all attorneys, all defense

experts, all plaintiffs' experts, and all parties. Therefore, for example, if both an attorney and an expert knowingly fail to meet a deadline or knowingly cause a deadline not to be met, the attorney and the expert will be *each*, not jointly, subject to the daily $100 minimum fine.

(3) Any request to extend a deadline must be in writing and must be *filed* with the court at least 72 hours (three days), weekends and holidays included, before the deadline.

(4) This order applies to orders entered by not only district judges but magistrate judges and special masters as well."[10]

*December 16, 1997:* In the meantime, and in light of the grave situation, the court solicited the help of all four of its United States Magistrate Judges to work with parties in developing hiring and promotion procedures as soon as possible. United States Magistrate Judge Susan Russ Walker was assigned the duty of overseeing the development of procedures for provisional appointments to the SPD project classifications and permanent appointments to the non-SPD project classifications. Judge Walker began addressing these issues immediately, and entered her amended recommendation concerning these procedures on December 16, 1997.[11] Judge Walker's work on the procedures for provisional appointments spanned nine months, and involved ten separate conferences with the parties.[12] The resulting recommendation as to how to proceed with provisional appointments covered 38 pages,[13] addressed in detail the issues raised by the parties, and provided a specific recommendation as to how the court and the parties should move forward in implementing provi-

7. Order, entered March 7, 1997 (Doc. no. 1624).

8. *Id.*

9. *Id.*

10. *Id.*

11. *See* amended recommendation of the magistrate judge, entered December 16, 1997 (Doc. no. 2340). This recommendation replaced Judge Walker's original recommendation, *see* recom-

mendation of the magistrate judge, entered November 12, 1997 (Doc. no. 2240), which was withdrawn. *See* order, entered May 5, 1998 (Doc. no. 2642).

12. *See* amended recommendation of the magistrate judge, entered December 16, 1997 (Doc. no. 2340), at 2–3 and 3 n. 2.

13. *See id.* at 4–41.

sional appointments. Judge Walker's recommendation contained two provisions in particular that are relevant to issue currently before the court. The first provision related to the defendants' proposal for the use of 'structured interviews' for making provisional appointments, and stated the following:

"Dr. Scarpello's plan presently contemplates at least some kind of content validation, as well as criterion-related validation, both concurrent and predictive. Doc. no. 2047. The court concludes that it is 'practicable' for defendants to improve and strengthen the plan proposed by Dr. Scarpello prior to commencing the preparation of structured interviews by seriously attempting to address plaintiffs' remaining concerns. It is also 'practicable' for defendants to make available one or both of defendants' industrial and organizational psychology experts, Drs. Goldstein and Schneider, or their similarly qualified designee, to meet with counsel for the parties and the intervenors and Dr. Scarpello to work out the best structured interview procedure that can be created under the circumstances.[22]

n.22. The court is well aware that these experts have other ongoing obligations in this case. However, their attention to this matter for a brief period will likely prevent considerably more expenditure of time and effort in the long run. Plaintiffs' experts may also attend this meeting if they wish; the court continues to encourage collaboration where possible.

"Accordingly, the undersigned recommends that the court order defendants immediately to convene a meeting of counsel, with one or more of defendants' experts and Dr. Scarpello present, to address plaintiff's concerns as much as is practicable consistent with the court's desire that provisional appointments proceed posthaste. Defendants should be directed to produce an amended proposal for creating

14. Because Judge Walker entered an original and an amended recommendation, *see supra* note 11, the parties' submission of objections was in response to both recommendations, and occurred over a period of time that did precede the date of entry of her amended recommendation.

structured interviews, including a specific plan and timetable for such validation as is also practicable. In addition, defendants should be ordered to convene a second meeting (with or without an industrial and organizational psychologist present, as necessary) to produce a detailed joint timetable for completing the preparation of, and administering, the structured interviews, and selecting the provisional appointees.[23] These tasks should be completed within 30 days of the time that such order is entered."

n.23. If the parties cannot agree on the order in which positions or classifications should be addressed in this schedule, they shall alternate their choices—that is, defendants shall designate the first priority, plaintiffs the second, defendants the third, and so forth.

The second provision related to screening applicants for interviews for provisional appointments, and stated the following:

"n.16. The preliminary scoring and ranking system for each position should be developed by the defendants (and their experts), in consultation with plaintiffs and intervenors, and should be completed at the same time that preparation of each structured interview is completed. The scoring system should judge an applicant's qualifications 'by reference to the minimum qualifications and job description contained in the announcement.' Doc. No. 753. Scoring determinations should be 'based solely on the qualifications of the applicants,' and should be made 'on a race-neutral basis.' *Id.* Relevant scoring and ranking documents should be retained by defendants."

As is required with any recommendation, the parties were afforded the opportunity to, and did, file objections to Judge Walker's recommendation.[14] None of the parties objected to either of these provisions.

*See* plaintiffs' corrected objections to the original recommendation, filed December 2, 1997 (Doc. no. 2305); defendants' objections to the original recommendation, filed November 25, 1997 (Doc. no. 2293); Adams intervenors' response to the

*May 8, 1998:* The court entered two orders adopting two different, uncontested provisions of Judge Walker's recommendation.[15] The first order related to the defendants' proposal for the use of structured interviews for making provisional appointments,[16] and the second related to screening of applicants for interviews for provisional appointments.[17]

The structured interview order began by quoting for the parties the relevant portion of Judge Walker's recommendation. The order then noted that none of the parties had objected to this recommendation, and that during oral argument on April 9, 1998, the parties generally agreed that this portion of Judge Walker's recommendation could go forward. Because Judge Walker's recommendation called for a specific set of events to occur, which was to begin with a meeting of the parties and their experts, and also called for an end product in the form of a completed proposal and schedule for implementation, the court ordered that the defendants comply with the terms of Judge Walker's recommendation, and submit the product to the court by 4:00 p.m. on June 8, 1998. In light of the lack of objection by the parties, the court ordered that *"there will be no continuances and no extensions of time,* not even for the purposes of mediation or settlement discussions." Finally, to ensure that there would be no problems understanding what was recommended by Judge Walker, the court closed with the following order:

"It is further ORDERED that, within five days, Judge Walker shall confer with counsel for the parties, on the record, to facilitate the defendants' compliance with this order, including making sure that counsel have a clear and common understanding of what the magistrate judge intended by the above provisions, and making sure the defendants have in mind an adequate plan for full compliance with this order within 30 days."

The screening procedure order was mostly identical to the structured interview order—specifically, it quoted for the parties the relevant portion of Judge Walker's recommendation, included the same provisions refusing continuances or extensions of time and ensuring that there would be no problems understanding what was recommended by Judge Walker, and set the same deadline for submission of the end product—but it did differ in two important respects. First, although the parties did not object to this provision of the recommendation, there was no specific agreement beyond that one way or the other as to whether the parties thought they could go forward with this recommendation. Second, Judge Walker's recommendation on this issue did not call for a specific set of events to occur, nor for a particular end product, so the court ordered that the defendants conduct the same set of events and produce the same end product as that contained in the structured interview order.

*May 15, 1998:* As directed in the May 8 orders, Judge Walker held a status conference concerning the orders. At this status conference, Judge Walker talked with the parties about what was required in the orders, and attempted to facilitate the defendants' compliance.

*May 22, 1998:* The defendants submitted a report concerning the use of structured interviews and screening procedures for provisional appointments and a withdrawal of their previous proposals for the interviews and screening procedures.[18] This report in-

---

plaintiffs' and defendants' objections, filed December 8, 1997 (Doc. no. 2317); plaintiffs' objections to the amended recommendation, filed January 12, 1998 (Doc. no. 2392).

**15.** When referring to both of these orders together, the court calls them the "May 8 orders."

**16.** *See* order, entered May 8, 1998 (Doc. no. 2654). When referring to this order individually,

the court calls it the "structured interview order."

**17.** *See* order, entered May 8, 1998 (Doc. no. 2659). When referring to this order individually, the court calls it the "screening procedure order."

**18.** *See* defendants' report concerning use of structured interviews and screening procedures for backlogged appointments and withdrawal of

dicated that the defendants had consulted with their experts, and had concluded that it was neither feasible nor desirable for them to go forward with developing either the structured interviews or the screening procedures because it would take nearly as long to develop these interim procedures as it would to develop the permanent procedures. This was the first indication to the court that the defendants did not intend to go forward as they had previously proposed, and thus that they would not comply with the May 8 orders. In this report, the defendants did not seek relief from the May 8 orders, but indicated that they would be filing motions seeking permission to go forward with other means of making provisional appointments.[19] Moreover, the court did not release the defendants from their obligation to comply with the orders.

On this date, Judge Walker held another status conference with the parties. In light of the defendants' report filed on this same day, the report and related issues dominated the discussion. Judge Walker, however, did not release the defendants from their obligation to comply with the May 8 orders.

*May 29, 1998:* The court held its monthly status conference.

*June 2, 1998:* In response to an exchange between the court and the parties during the May 1998 monthly status conference that indicated an apparent misunderstanding by the defendants that they are expected to comply with the deadlines set in the court's orders, the court entered an order reaffirming its March 7, 1997, order by stating that "that *all* orders of the court (by the district judge and the magistrate judges) must be complied with in *all* respects unless vacated or modified." [20] The order stated in full:

"In light of the representations made by counsel for the parties at the monthly status conference held May 29, 1998, it is

ORDERED and REAFFIRMED that *all* orders of the court (by the district judge and the magistrate judges) must be complied with in *all* respects unless vacated or modified. The court does not recognize assumptions by the parties that deadlines in orders need no longer be met, and it does not recognized private agreements among the parties extending deadlines."

*June 3, 1998:* In response to her efforts to work with the parties to assist them in compliance with the May 8 orders, and based on the defendants' submissions to the court following the entry of the May 8 orders, Judge Walker issued an order clarifying the defendants obligations under the orders.[21] She emphasized that the defendants had not complied with the orders, nor had they been relieved of their obligations to comply as the court indicated they must in its June 2 order.

*June 8, 1998:* This was the date by which the defendants were to comply with the May 8 orders. *Despite* the directive by the court in its May 8 orders that "there will be no continuances," and *despite* the requirement by the court in its May 8 orders that the parties "confer" with Judge Walker to make sure that they have a "clear and common understanding of what [Judge Walker] intended" in her recommendation, and *despite* the court's later order of June 2 "that *all* orders of the court ... must be complied with in *all* respects unless vacated or modified," and *despite* Judge Walker's June 3 admonition that the defendants had not been relieved of their obligations to comply, the defendants submitted a response that essentially reflected that the defendants had decided, independently and without court approval, that they would not comply with the May 8 orders. The defendants' response to the structured interview order began with a set of general objections to the court's order, and then went on to reiterate what the defendants stated in their May 22 report—specifi-

---

proposals for same, filed May 22, 1998 (Doc. no. 2710).

**19.** *See id.* at 3.

**20.** Order, entered June 2, 1998 (Doc. no. 2751).

**21.** *See* order, entered June 3, 1998 (Doc. no. 2758).

cally, that their experts had concluded that it was not feasible to go forward with developing structured interviews.[22] The defendants then stated the following:

> "Defendants' experts will initiate discussions with Plaintiffs' expert to take place not later than July 10, 1998, to seek agreement on procedures for structured interview for SPD project classes on a permanent basis. Defendants' experts will determine whether general interviews can be validated for a number of classifications. If this cannot be agreed on, Defendants' experts (and Plaintiffs' experts if they agree) will oversee development of structured interviews for each classification, which will take much longer. All structured interviews for SPD project classes, whether general or special, should be developed after the test for a given classification has been approved and while announcements, application periods and test administration are taking place. No appreciable delay (30 days or less) is foreseen in having interview procedures in place after certificates of eligibles are issues from SPD project class registers.

> "Schedules for development of structured interviews for the non-project classifications are less clear. If a general type interview can be validated for more than one classification, the interviews may be developed much earlier, than if validations for each classification are required. Prior validation studies for each classification would be necessarily have to be examined before a timetable could be developed for individual interview procedure. If the validation studies proved inadequate, subject matter experts would need to be consulted and the procedure would be similar to that required for test validation. There is no

way that Defendants' experts currently can predict or even guess at what will be involved here."

The defendants response to the screening procedure order also began with general objections to the court's order, and reiterated what the defendants had stated in their May 22 report.[23]

*June 16, 1998:* The plaintiffs filed their motion for civil contempt charging that the defendants had failed to comply with the May 8 orders.[24]

*June 17, 1998:* The court entered an order requiring the defendants to show cause, in writing, as to why the plaintiffs' motion for civil contempt should not be granted.[25] The defendants' response was due by 12:00 noon on June 19, 1998. The court also set a hearing on the motion for June 22, 1998. Finally, the court noted that it "realizes that it is moving swiftly on this matter, but time is of the essence in addressing the issues presented in the plaintiffs' motion."

*June 18 and 19, 1998:* On June 18, 1998, the defendants filed a motion to continue the contempt hearing.[26] On June 19, the court denied the motion, stating that, "As this court has previously stated, time is of the essence, and compliance must be obtained now."[27] The court explained that "The employees of the Transportation Department, both black and white (and, in particular, the black class members who have now been denied relief for over two years *past* the time allowed by the consent decree), have been waiting for over four years for promotions, and they should not have to endure, not one additional day longer than absolutely necessary, any further delay in establishing procedures for promotions."

---

22. *See* defendants' response to court's order dated May 8, 1998 (Doc. no. 2654), filed June 8, 1998 (Doc. no. 2778).

23. *See* defendants' response to court's order dated May 8, 1998 (Doc. no. 2659), filed June 8, 1998 (Doc. no. 2779).

24. *See* plaintiffs' third motion for contempt, filed June 6, 1998 (Doc. no. 2825).

25. *See* order, entered June 17, 1998 (Doc. no. 2834).

26. *See* defendants' motion to continue hearing, filed June 18, 1998 (Doc. no. 2843).

27. Order, entered June 19, 1998 (Doc. no. 2852).

The court further noted that "On this issue—the failure of the defendants to proceed in a timely manner in the fashioning of provisional appointment procedures, as required by the May 8 orders—the employees in the department are united. Both the plaintiffs (who represent black employees) and the Adams intervenors (who represent white employees and other non-black employees) are united in the complaint that the defendants have without excuse failed to comply with the two orders at issue."

The court rejected the defendants' contention that they needed more time to prepare for the hearing:

"'More time' is now the calling card for the defendants. Moreover, the requirements set forth in the May 8 orders were simple and direct—the initial requirement being simply to hold meetings—with added instructions from the court that if the parties needed clarification they should have contacted Magistrate Judge Walker. The issue to be considered by the court on the contempt motion is simple, and is whether the defendants unilaterally and without court approval (or even a request for clarification), from either the district judge or magistrate judge, decided not to comply with the orders. The issue is not whether the meetings called for the orders would have been successful, but whether the defendants failed to hold the meetings as demanded by the orders, *the requirements of which the defendants agreed to.*"

Finally, the court set a new date for the defendants to begin compliance with May 8 structured interview order. The court stated:

"The defendants are to comply with the order entered on May 8, 1998 (Doc. no. 2654), by holding the "meeting" on June 26, 1998, beginning at 9:00 a.m. in the fifth floor courtroom of the federal courthouse in Montgomery, Alabama. The parties and the experts are to report to Magistrate Judge Walker prior to the meeting, and the meeting is to be conducted under Judge Walker's supervision."

The court further explained that, "To be sure, with this order, the court has established a new deadline for the experts to meet with counsel to establish procedures for provisional promotions.... However, in light of the defendants' history of repeated delays, followed by excuse after excuse after excuse, the court cannot trust that they will comply with this new date."

Also, on June 19, the defendants filed their response to the court's order to show cause.[28]

*June 22, 1998:* The court entered a new order similar to the one regarding structured interviews, setting a new date for the defendants to begin compliance with the May 8 screening order.[29]

*June 22 and 23, 1998:* The court held a hearing on the plaintiffs' motion for civil contempt. On this same day, the plaintiffs' filed a pre-hearing brief in support of their motion for civil contempt.[30] The defendants requested an opportunity to respond to the plaintiffs' pre-hearing brief, and due to the court's desire to move expeditiously, the court ordered that the defendants respond by 4:00 p.m. on June 23, 1998.

*June 23, 1998:* After noting that the two orders entered on June 19 and 22 required only that the defendants "convene a meeting of the parties and their experts at a specific date and time," but that the May 8 orders actually required "the parties to go through a discussion and negotiation process, and submit the results of this process to the court," the court entered an additional order requiring that the defendants "comply with the court's orders, entered May 8, 1998 ... in full, and ... submit the product of that compliance to the court no later than 4:00 p.m. on

---

28. *See* defendants' response to order to show cause, filed June 19, 1998 (Doc. no. 2848).

29. *See* order, entered June 22, 1998 (Doc. no. 2860).

30. *See* plaintiffs' pretrial brief on civil contempt, filed June 22, 1998 (Doc. no. 2857).

July 24, 1998, unless the defendants are otherwise relieved of compliance with these orders."[31]

The defendants also filed their response to the plaintiffs' pre-hearing brief.[32]

## II. DISCUSSION

 "[C]ivil contempt proceeding[s are] brought to enforce a court order that requires [a party] to act in some defined manner." *Chairs v. Morgan County Sheriff Buford Burgess,* 143 F.3d 1432, 1436 (11th Cir. 1998) (quoting *Mercer v. Mitchell,* 908 F.2d 763, 768 (11th Cir.1990)). The initial burden is on the movant to "establish by clear and convincing evidence that the alleged contemnor[s] violated the court's earlier order." *United States v. Roberts,* 858 F.2d 698, 700 (11th Cir.1988) (citation omitted). If the movant satisfies this burden, the burden then shifts to the defendants to show cause as to why they should not be held in contempt and sanctioned until they comply with the court's order. *See Mercer,* 908 F.2d at 768. At the show cause hearing, the defendants must show "either that [they] did not violate the court order or that [they were] excused from complying." *Id.* If the defendants succeed in this showing, the burden shifts back to the movant to show that compliance was possible. *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.,* 950 F.2d 1525, 1529 (11th Cir.1992); *see also Combs v. Ryan's Coal Co.,* 785 F.2d 970, 984 (11th Cir.1986) ("The party seeking the contempt citation retains the ultimate burden of proof.").

 The defendants may be excused because of an "inability" to comply with the terms of the order. *See Citronelle–Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir.1991); *Roberts,* 858 F.2d at 701. To satisfy this burden, the defendants must "offer proof beyond the mere assertion of an inability." *Watkins,* 943 F.2d at 1301. The defendants can "demonstrate an inability to comply only by showing that they have made 'in good faith all reasonable efforts to comply.'" *Id.* (quoting *United States v. Ryan,* 402 U.S. 530, 534, 91 S.Ct. 1580, 1583, 29 L.Ed.2d 85 (1971)); *see also Roberts,* 858 F.2d at 701; *Newman v. Graddick,* 740 F.2d 1513, 1525 (11th Cir.1984) ("[A] person who attempts with reasonable diligence to comply with a court order should not be held in contempt."). "The district court initially determines whether an alleged contemnor possesses the ability to comply." *Watkins,* 943 F.2d at 1301.

 "In contempt proceedings, 'the basic proposition [is] that all orders and judgments of courts must be complied with promptly.'" *Jim Walter Resources, Inc. v. International Union, United Mine Workers of Am.,* 609 F.2d 165, 168 (5th Cir.1980) (quoting *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975)). It is also important to remember that "[i]ntent is not an issue." *Id.* "'[I]n civil contempt proceedings the question is not one of intent but whether the alleged contemnors have complied with the court's orders.'" *Id.* (quoting *United States v. Ross,* 243 F.Supp. 496, 499 (S.D.N.Y.1965)).[33]

### A.

 Set against the legal standards governing the court's consideration of a motion

**31.** *See* order, entered June 23, 1998 (Doc. no. 2879).

**32.** *See* defendants' response to plaintiffs' pretrial brief and motion to disqualify plaintiffs' counsel and to strike affidavit, filed June 23, 1998 (Doc. no. 2883).

**33.** In the later case of *Newman v. Alabama,* 683 F.2d 1312 (1982), the Eleventh Circuit Court of Appeals used the following language to dispense with the concern that, because a need for wilfulness would most often preclude a finding of civil contempt, adequate civil enforcement would be difficult: "At oral argument, counsel for the State suggested that an adjudication of contempt would never be appropriate in this case because the State's good faith efforts at compliance with the consent decree would preclude a finding of wilfulness which, according to the State, is a necessary element of civil contempt. The Supreme Court long ago disposed of this contention: 'The absence of wilfulness does not relieve from civil contempt. Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance.... Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act.' *McComb v. Jacksonville*

for civil contempt, the evidence in this case clearly and convincingly supports the conclusion that the defendants have acted in contempt of this court. First, the court had in effect two orders—the May 8 orders—that imposed obligations on the defendants,[34] and the defendants do not dispute that they were aware of the orders.[35] In addition, the court must emphasize that the orders were simple and straightforward, and allowed for little, if any, uncertainty about their command. For example, there could not have been any uncertainty about what portions of Judge Walker's recommendation the court intended for the defendants to implement because, in the May 8 orders, the court quoted the relevant portions of the recommendation. And there could not have been any uncertainty about what Judge Walker meant in these provisions because, even if the text was unclear, the court ordered that the parties meet, and they did meet, with Judge Walker to be sure that they had a "clear and common understanding" of what she meant.

The court must also emphasize that the actions that the court ordered the defendants to take—convening meetings of the parties and their experts, and producing plans and schedules for implementation of two provisions of the recommendation over the course of a 30–day period—were drawn directly from Judge Walker's recommendation. All of the parties had the opportunity to object to these portions of Judge Walker's recommendation, and none of the parties did object, so the court could only assume that implementation of these provisions was ready to go forward.

One last point of emphasis is that there could be no question that the court intended for the defendants to comply with its orders. As a general matter, compliance with court orders is axiomatic. *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1208 (11th Cir.1985) ("As a fundamental proposition, orders of the court 'must be obeyed until reversed by orderly review or disrobed of authority by delay or frustration in the appellate process....'") (quoting *United States v. Dickinson*, 465 F.2d 496, 509 (5th Cir.1972)); *see also GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 386–87, 100 S.Ct. 1194, 1201–02, 63 L.Ed.2d 467 (1980); *Maness*, 419 U.S. at 458, 95 S.Ct. at 590. But in this particular case, the court went out of its way in its May 8 orders to emphasize that because the parties agreed to Judge Walker's recommendation it would not grant any extensions of its deadlines—it expected compliance by June 8. The court also entered a separate order on June 2 reaffirming that the parties must comply with *all* orders of the court in *all* respects unless the orders have been vacated or modified. Finally, Judge Walker, on June 3, entered another order reaffirming that the defendants were still required to comply in full with the May 8 orders.

The court therefore now turns to the first question, which, while critical, is essentially undisputed: whether the defendants complied with the May 8 orders. The defendants essentially admit that they did not hold the meetings required by the orders. Thus, the plaintiffs have established by clear and convincing evidence that the defendants failed to comply with the orders.

The real focus of the dispute is on whether the defendants have met their burden of showing "[they were] excused from complying." *Mercer*, 908 F.2d at 768. In their defense, the defendants argue that they misinterpreted the May 8 orders, and did not understand what they were directed to do.

Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949) (citations omitted)." *Id.* at 1318 n. 16.

**34.** The court notes that the defendants have filed notices of appeal for both of the May 8 orders. *See* notice of appeal, filed June 8, 1998 (Doc. no. 2780); notice of appeal, filed June 8, 1998 (Doc. no. 2781). Nonetheless, the orders remain in full force and effect because they have not been stayed or vacated by this court or the United States Court of Appeals for the Eleventh Circuit.

**35.** Indeed, the two orders were not only mailed to the defendants' attorneys, they were also faxed to them on the date of entry.

They argue that they "believed that such orders required submission by June 8 of the actual procedures for structured interviews and screening, as well as schedules for their development and administration." [36] This assertion is completely incredible, if for no reason other than that it is a contradiction in its own terms. If the defendants thought it sensible that they would have to submit "actual procedures" as well as "schedules for their development" on the same date, they have far more serious problems than the court has previously imagined.

In any event, the plaintiffs point to considerable evidence that the defendants were well aware that they were to be working on a schedule for development and implementation of structured interviews and screening procedures, and not the final product of these two things. This came up in the status conferences with Judge Walker in the following exchange:

"[ADAMS INTERVENORS' COUNSEL]: Can I just—Judge Walker, one of the things I noticed, in both of Judge Thompson's orders he says he wants everybody to have a clear and common understanding. On the screening, what I understand we'll be looking for is a kind of a protocol, a proposal of how it's to be done, one example, one application of it to a classification as a for-instance. .

"THE COURT: Yeah, I was just going to say I think it should include a for-instance. I wouldn't limit it to that.

"[ADAMS INTERVENORS' COUNSEL]: But we're not saying the actual screening as applied to every classification. Are we all in agreement—

"THE COURT: I think that's correct. I don't think you can get that done, can you?

"[DEFENDANTS' COUNSEL]: No, ma'am.

"THE COURT: But what you do need to do is determine how you're going to get that done. And that is to include a specific timetable."

"[DEFENDANTS' COUNSEL]: Yes." [37]

It also came up in the pleadings the defendants filed with the court:

"Defendants are in agreement with the Magistrate Judge's recommendation that they proceed with development of structured interviews for provisional appointment positions as proposed by Dr. Vida Scarpello. Defendants further agree that a meeting should be convened at which Dr. Scarpello and plaintiffs' experts may communicate directly concerning plaintiffs' input on the interview process, and that defendants should thereafter devise a schedule for the development of the interviews." [38]

Finally, it came up in the arguments before the district judge.[39] And, in case there was any lingering doubt, Judge Walker made it abundantly clear in her June 3 order that proposals and timetables, not final products, were required.[40] The court can give no weight to this argument by the defendants.

Even if credulity could be stretched to include the defendants' contention that they misunderstood the May 8 orders, the contention would not save the defendants here. First, even *after* the defendants had supposedly concluded that they should not proceed with the meetings required by the May 8 orders, both the district judge and the magistrate judge entered orders on June 2 and 3 reaffirming that all orders—and, in particular, the May 8 orders—must still be complied

---

**36.** Defendants' response to order to show cause, filed June 19, 1998 (Doc. no. 2848), at 1.

**37.** Transcript of in-chambers status conference, held May 15, 1998, at 19–20; *see also id.* at 10–11, 18–22.

**38.** Defendants' response and objections to the recommendations of the magistrate judge, filed November 25, 1997 (Doc. no. 2293), at 5.

**39.** *See* transcript of 73d day of nonjury trial, held April 9, 1998, at 42–43.

**40.** *See* order, entered June 3, 1998 (Doc. no. 2758).

with unless vacated. The defendants had no basis not to proceed with the meetings. But more importantly, in the May 8 orders, the court made clear that disputes about compliance should be brought to Judge Walker's attention. Indeed, the court went out of its way to require that questions about compliance be brought to the magistrate judge's attention so as to avoid the very excuse that has become all too common in this litigation, and has contributed to much of the delay: "I did not understand what I was suppose to do." In the face of these court directives and in light of the history of delay after delay in this litigation, the defendants' unilateral decision not to comply with the court's orders, and in particular, not to hold even the required meetings, is unsupportable.

The defendants' next argument in their defense is that the development of structured interviews and screening procedures is not feasible. First, the issue of whether the development of structured interviews and screening procedures is feasible is the very topic that should have been taken up at the meetings required by the orders; the issue should not have been the basis for canceling the meetings. But more importantly, the evidence is clear and convincing to the court that this reason is just not credible. For nine months, the parties and Judge Walker litigated the issue of feasibility, and, after Judge Walker entered her recommendation, the defendants, though given the opportunity, offered no objection, let alone one stating that the recommended structured interview procedures and screening were now not feasible. The defendants' contention that the procedures were not feasible is not only tardy, it is belied by their own conduct.

The defendants maintain that after the May 8 orders were entered, they spoke with their expert, Dr. Irwin Goldstein, who told them that the procedures were not feasible. This argument does not wash either. First

of all, Dr. Goldstein, who testified at the June 22 and 23, 1998, hearing, stated that he did not tell the defendants that the screening procedures required by the May 8 orders were not feasible; indeed, Dr. Goldstein said he was unaware of this requirement in the orders:

"Q: Let's look at document 2659.

"[DR. GOLDSTEIN]: Yes?

"Q: That's the one that deals with screening procedures to determine who is eligible for an interview. Have you seen that document before?

"[DR. GOLDSTEIN]: I don't believe so.

"Q: [Has] the subject matter of that document ever been discussed with you?

"[DR. GOLDSTEIN]: I don't believe so.

"Q: Have you ever done anything or said anything related to compliance with that order, 2659?

"[DR. GOLDSTEIN]: I don't believe so. I don't think we've been asked to worry about the screening proposals." [41]

Thus, it appears that the statement in the defendants' May 22 report—that "Dr. Goldstein ... advises that the development of adequate screening procedures to create a manageable pool of persons to be interviewed using the proposed interim procedures ... is not feasible"—is an untruth.[42] It is apparent that the defendants not only had no basis for their failure to comply with the May 8 screening procedure order, the defendants also attempted to mislead the court in a formal pleading.

In addition, Dr. Goldstein made clear in his testimony that his strong reservations about the structured interviews required by the other May 8 order surfaced in the fall of 1997, before Judge Walker entered her final recommendation in December 1997, and long

---

**41.** *See* transcript of 2d day of hearing on motion for civil contempt, held June 23, 1998, at 60–61.

**42.** Defendants' report concerning use of structured interviews and screening procedures for backlogged appointments and withdrawal of proposals for same, filed May 22, 1998 (Doc. no. 2710).

before entry of the May 8 structured interview order.[43] Therefore, any doubts about the feasibility of the procedures should have been brought to the court's attention before Judge Walker entered her recommendation, and definitely before the court entered the May 8 structured interview order. Their failure to do so has no excusable basis. Therefore, the defendants cannot saddle Dr. Goldstein with the blame for their failure to comply with the orders. Moreover, and in any event, even if the defendants did not reach the conclusion that the structured interview procedures were not feasible until after May 8, they were still not justified in scuttling the meetings. In the face of the June 2 and 3 orders from the district judge and Judge Walker that the May 8 orders were still to be complied with, the defendants were still obligated to proceed with the meetings.[44]

One other theme that underlies the defendants' argument, that the development of the structured interviews and screening procedures is not feasible, is a contention they have made repeatedly: that permanent selection procedures will be in place sometime soon, and so it makes no sense to develop the interim procedures that would take equally as long. First and most obviously, this contention does not wash because the contention was on the table long before entry of the May 8 orders. The defendants have repeatedly made the argument, and the court has repeatedly rejected it. Moreover, the assertion that permanent selection procedures will be in place sometime soon is directly belied by the entire history of this litigation, which has involved delay after excuse after failure to comply. Because the permanent procedures are not much closer to being implemented than they were when the consent decree was adopted on March 16, 1994, this argument did not, and cannot,

serve as a reasonable basis for not going forward with interim procedures required by the May 8 orders.

■■■ The defendants' final argument in their defense is that they were denied due process by having this matter considered on such an expedited schedule. This argument is also without merit. As the *Mercer* court made clear, "[w]hen the purportedly contumacious conduct occurs outside the presence of the court, due process requires, with very few exceptions, that the defendant (1) be informed, through a show-cause order, of his purportedly contumacious conduct, and (2) be given a hearing at which he can be represented by counsel, call witnesses, and testify in order to show cause why he should not be held in contempt." *Mercer,* 908 F.2d at 766–67 (footnotes and citations omitted). The amount of notice and time to prepare a defense that is required varies depending on the circumstances, and can never be less than is required to mount an adequate defense. *See United States v. Alter,* 482 F.2d 1016, 1023 (9th Cir.1973). But a period of a few days is widely acceptable in cases that are relatively simple. *See In re Timmons,* 607 F.2d 120, 125 (5th Cir.1979) ("Other circuits have held two days, or even one day, to be adequate time for preparation [of a defense to criminal contempt charges] in uncomplicated cases of this type.") (citations omitted); *Alter,* 482 F.2d at 1023–24 ("In some cases all the important issues will have been raised by the time of the immunity hearing, and it will be apparent that the actual contempt can raise no new issues. If so, the witness may have had adequate time to prepare even though very little time elapses between the alleged contempt and the contempt hearing.").[45] In this case, the issues are straightforward and did not require

---

**43.** *See* transcript of 2d day of hearing on motion for civil contempt, held June 23, 1998, at 41–42.

**44.** Furthermore, even if the court were to credit the defendants' contention that they did not learn from their expert until after May 8 that the proposed structured interview procedures were not feasible, the defendants would still not be without substantial blame. The fact that, for months, the defendants led the other parties and

the court to believe that the procedures were acceptable without first having cleared the procedures with their own experts, warrants censure in and of itself.

**45.** The *Alter* court went on to note that the burden for speedy consideration of contempt charges fell on the government, which was the movant in the case. Here, the plaintiffs have

much time to prepare. Additionally, the defendants were on notice of the relevant issues from the moment they were served with the motion for contempt on June 16, 1998, and they had five days to prepare after the order to show cause was entered on June 17. This provided more than adequate time to them.

Having considered the arguments offered by the defendants in defense of the charges of civil contempt, the court holds that the defendants are in contempt of this court. There were clear orders in effect, with which the defendants failed to comply. The defendants also have no credible and reasonable explanation that can excuse their behavior.

### B.

■■■■ The court has the power to impose coercive and compensatory sanctions. *In re Chase and Sanborn Corp.*, 872 F.2d 397 (11th Cir.1989). " 'The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief. This may entail the doing of a variety of acts....' " *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507, 1515 (11th Cir. 1987) (quoting *United States v. United Mine Workers*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947)). When fashioning a sanction to secure compliance, a district court should consider " 'the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired.' " *EEOC*, 828 F.2d at 1515 (quoting *United Mine Workers*, 330 U.S. at 304, 67 S.Ct. at 701).

■■■■ Sanctions may be imposed to coerce the contemnor to comply with the court's order, but may not be so excessive as to be punitive in nature. *Matter of Trinity*, 876

F.2d at 1493. The court's discretion "must stay within the bounds of due process." *Mercer*, 908 F.2d at 766. Thus, although the district court has the authority to impose sanctions designed to ensure compliance, the sanctions cannot be any greater than necessary to ensure such compliance. *Id.* at 768 n. 9.

Here, the court has yet to be informed as to what sanctions would be sufficiently coercive to assure the defendants' compliance with the May 8 orders. Regrettably, the fact that this litigation has already cost the defendants millions of dollars has not hastened and assured their compliance with orders. Moreover, the court's June 2, 1998, order was not the first time that the court had cautioned the parties about noncompliance with orders. As shown, in an order entered a year earlier on March 7, 1997, the court instructed the parties that it would impose a minimum fine of $100 per day for a failure to meet any deadlines contained in orders of the court. But, apparently, this March 7 order was not sufficiently threatening to bring about compliance. The bottom line is compliance with the May 8 orders, and the imposition of a sanction just to be able to say a sanction has imposed would not only be meaningless, it would further add to the delay. The court therefore believes the wisest course to follow is to solicit *immediate* input from the parties. The court will therefore set a brief hearing for Tuesday, June 30, 1998, at 8:00 a.m., on the issue of sanctions. In addition, and in the meantime, the defendants will have had an opportunity to convene the first of the meetings required by the May 8 orders, and the court will able to receive a report on whether the meeting took place.

### III. CONCLUSION

In conclusion, the court finds by clear and convincing evidence that the defendants are

---

stated, and the court agrees, that the issues are simple and straightforward. The defendants only argument in response is that they have a lack of time to prepare an adequate defense. The defendants have not suggested what evidence they would present if they had more time to prepare.

The defendants did, however, advance a few reasons in support of their not having enough

time to prepare. They included that some of their key witnesses were not available to testify, that the defendants would suffer due process violations because of pending criminal contempt charges, and that there were subpoenas out with which they did not want to comply. Through accommodation and orders of the court, all of these matters were subsequently cured or resolved.

in civil contempt of the court's May 8 orders. However, in stating this obvious conclusion, the court is compelled to reaffirm that much more was, and is, at stake than two court orders: what lies behind the orders must also be remembered. First, as stated, the May 8 orders were the product of nine months of time and expenses devoted by the parties and the court (in particular, Judge Walker) to this litigation.[46] The recommendation that underlies the two orders was carefully and thoughtfully crafted, and, indeed, the defendants did not even object to the parts of the recommendation that led to the two orders. The defendants' sudden and unilateral scuttling of this extensive and expensive effort can be characterized as only cold and insensitive disrespect for all others involved. But in a personal and even more important way, the defendants' conduct is also contemptuous of the employees of the Transportation Department. It has now been over four years since the department had procedures for promotion, and, over this time, the department's employees have been denied the benefit of earned promotions. It is therefore not surprising that all employees of the Transportation Department, both black and white, agree on two things: first, the time is now long overdue for the development of open, fair, and competitive promotion procedures; and, second, in light of these circumstances, the defendants had no reasonable basis whatsoever not to comply with the May 8 orders.

Accordingly, for the above reasons, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) The plaintiffs' motion for civil contempt, filed on June 16, 1998 (Doc. no. 2825), is granted.

(2) It is DECLARED that the defendants, the Alabama Department of Transportation, the Alabama State Personnel Department, Jimmy Butts (Director of the Transportation Department), and Thomas G. Flowers (Interim Director of the Personnel Department) are each in civil contempt for failing to comply with the court's orders, entered May 8, 1998 (Doc. nos. 2654 & 2659).

(3) A hearing is set for June 30, 1998, at 8:00 a.m., to consider what sanctions would be sufficiently coercive to assure these defendants' full and timely compliance with the May 8 orders.

The clerk of the court is DIRECTED to provide for service of this civil contempt order upon defendants Alabama Department of Transportation, Alabama State Personnel Board, Jimmy Butts, and Thomas G. Flowers, by certified mail, returned receipt requested.

## SUPPLEMENTAL CIVIL CONTEMPT ORDER

This matter is now before the court on the supplemental question of whether sanctions, if any, should be imposed on the defendants, the Alabama Department of Transportation, the Alabama State Personnel Department, and two of their officials, in light of the court's June 25, 1998, order, finding them in civil contempt.[1] A hearing was held on this question on June 30, 1998. Before reaching the issue of sanctions, however, the court will first address an important concern raised by the defendants at the supplemental civil contempt hearing held June 30, 1998.

The defendants continue to contend that compliance with the May 8 orders is impractical, if not impossible.[2] The defendants argue that the Transportation Department urgently needs to fill vacancies within the next month or so, and that it is impossible to

---

**46.** Parties and the public often overlook that litigation is also expensive for the court. Hearings and other proceedings require court personnel (for example, court reporters and courtroom deputies), all of whom, with added litigation, must be added to the court's personnel and, of course, must be paid.

**1.** See civil contempt order, entered June 25, 1998 (Doc. no. 2890).

**2.** See orders, entered May 8, 1998 (Doc. nos. 2654 & 2659).

develop and implement 'structured interviews' and 'screening procedures' in time for these appointments. This argument shows that the defendants still grossly misapprehend the status of this litigation.

It may be impossible to develop and implement open and competitive race-neutral promotional procedures, for both provisional and permanent appointments, that meet the requirements of consent decree I and all other outstanding orders, in time for the needed appointments in July and August of this year. A different promotional procedure may be needed to make these appointments. But this need, while related to, is separate from the continuing and longstanding need for an open and competitive race-neutral promotional process that meets the requirements of consent decree I and all other outstanding orders. The fact that this long-term process may not be ready for implementation by July or August of this year does not diminish the need for this process *as soon as possible*. As this court stated only last week, on July 1, 1998,

"The court does not mean to dampen the efforts of the parties to pursue alternative interim promotional procedures to address the crisis the Alabama Department of Transportation is now facing. However, these interim procedures would be only that—interim. Moreover, should the procedures be race conscious, they could be used only so long as special or extraordinary circumstances warrant them. The

court therefore agrees with the Adams intervenors, and so instructs the parties, that they still cannot relent, even for a moment, in their pursuit of·race-neutral provisional and permanent hiring and promotional procedures that meet the requirements of consent decree I and all outstanding court orders. In other words, the need for race-neutral provisional and permanent hiring and promotional procedures is, and still remains, urgent." [3]

Therefore, the defendants are still obligated to comply *in full* with the May 8 orders by July 24, 1998, the new compliance date already set by an order entered June 23, 1998.[4] They must still hold the meetings required and· address the concerns raised in the orders.

Admittedly, as stated, there appears to be a critical need to fill vacant positions at the Transportation Department, and, without question, there is a need to address this crisis now. Indeed, the court has set a hearing on this crisis for this Friday, July 10, 1998. However, as the court has further attempted to make clear, the defendants must also still· address, in tandem with this crisis, the continuing urgent need for an open and competitive race-neutral promotional process that meets the requirements of consent decree I and all other outstanding orders. The crisis cannot distract the defendants from compliance with the May 8 orders. In short, the defendants must work on both fronts simultaneously.[5]

---

3. *See* order, entered July 1, 1998 (Doc. no. 2919).

4. *See* order, entered June 23, 1998 (Doc. no. 2879).

5. At one point during the June 30 hearing, counsel for the defendants asked how they could comply with the May 8 orders if their experts had already determined that the requirements of the orders could not be met in time for needed appointments in July and August of this year. This question reflects an improper conflating of the two important issues. As stated, the fact that the May 8 requirements cannot be satisfied in time for the current promotional crisis does not diminish the fact that the May 8 requirements must still be met, and as soon as possible, for all future promotions. Time constraints, admitted-ly, may be an insurmountable problem in meeting the current crisis; time constraints, while· a critical factor, are not necessarily insurmountable with regard to the urgent, longstanding need to fashion and implement an open and competitive race-neutral promotional process that meets the requirements of consent decree I and all other outstanding orders.

Admittedly, the defendants' experts may have suggested that the parties should abandon provisional appointments for permanent appointments. The court is concerned, however, that the defendants' experts' suggestion is based on erroneous premises. First, it appears that the defendants' experts are improperly conflating the two important issues, as described above. Second, the defendants' experts, at the time they made this suggestion, appear to have had an

With these comments, the court now turns to the matter of sanctions. It is apparent from the representations of the lead counsel for the defendants at the June 30 hearing, that the defendants still want to rock along with the status quo and that they still refuse to acknowledge the critical need for meetings such as those required by United States Magistrate Judge Susan Russ Walker and the court in the May 8 orders. At the June 30 hearing, the lead counsel characterized the initial meeting held under the May 8 orders as follows:

> "THE COURT: Let me ask you this: Do you think that you gained nothing from the meeting last week and the proceedings before Judge Walker?
>
> "MR. ELLIOTT: We gained nothing?
>
> "THE COURT: Yes, that's what you're telling me. You said I should not have required you to have the meeting. You're saying, in this litigation, and you gained nothing from those proceedings. You learned nothing: that proceeding in no way last week helped you move forward with the creation and implementation of race-neutral or open and competitive procedures. Is that what you're saying? Are you saying that didn't help at all, holding that meeting?

> "MR. ELLIOTT: I don't think it helped at all holding the meeting. I think we could have accomplished the same thing in the method we were going about, talking to our experts, getting their advice, determining from them what feedback they were getting from the plaintiffs' experts. I think that information was out there. Whatever it is we learned collectively, we had already learned individually, and will continue to—"[6]

It is apparent from these comments by lead counsel that the defendants refuse to acknowledge the continuing and longstanding need for an open and competitive race-neutral promotion process that meets the requirements of consent decree I and all other outstanding orders. A simple cursory review of the transcript of the June 25 meeting fully refutes the characterization the lead counsel gave to the meeting.[7] In fact, a consideration of the meeting in the context of the overall litigation would reasonably lead to the conclusion that the meeting was not only productive, it was a milestone. The gathering together of both plaintiffs' and defendants' experts, under the supervision of Judge Walker, brought forth a united report from the experts as to what some of the critical issues in this litigation are and how those issues should be addressed—in particu-

---

unrealistic expectation of when the permanent procedures would be ready for implementation. As both the plaintiffs' and the defendants' experts recognized at the proceeding before United States Magistrate Judge Susan Russ Walker on June 25, 1998, the training issue may delay implementation of promotional procedures even longer.

Finally, even if the defendants have concluded that it is no longer worthwhile, or beneficial, to pursue structured interviews and screening procedures for provisional appointments, the court has not yet reached such a conclusion, and until the court relieves the parties of their obligations with regard to structured interviews and screening procedures, the obligations remain. Therefore, the court still expects the defendants to hold the required meetings and to file the required reports with regard to the following: first, the need "to produce an amended proposal for creating structured interviews, including a specific plan and timetable for such validation as is also practicable," Order, entered May 8, 1998 (Doc. no. 2654); and, second, a proposal with respect to screening procedures, that is, the "preliminary scoring and ranking system for each position," Order, entered May 8, 1998 (Doc. no. 2659). To the extent that training is a problem, the experts should continue to address it, and they should also factor it into the reports to be filed with the court. The training problem is not a justification for bringing efforts at compliance with the May 8 orders to a halt.

**6.** Transcript of motion for contempt hearing on sanctions held June 30, 1998, at 12–13.

**7.** To be sure, co-counsel for the defendants later acknowledged the value of the June 25 meeting, stating "that the experts learned some valuable things that are going to help them going forward in their discussions about the permanent selection procedures." Transcript of motion for contempt hearing on sanctions held June 30, 1998, at 44. However, the court assumes that it should defer to the representation of the defendants' lead counsel.

lar, the need to address the training issue as soon as possible, for both provisional and permanent appointments.[8] Therefore, in light of the defendants' past contumacious conduct and in light of their evident reluctance to participate in fruitful efforts to move this litigation forward as quickly as possible toward the creation and implementation of open and competitive race-neutral promotion procedures for both provisional and permanent appointments, the court concludes that significant and substantial monetary sanctions are not only appropriate, they are desperately needed. Therefore the court will require the defendants to pay into the registry of this court the sum of $50,000.00 for each day that they fail to comply in full with the May 8 orders after July 24, 1998. This monetary sanction shall continue for up to ten business days. If, after ten business days, the defendants have still not complied in full with the May 8 orders, the court will then consider whether additional sanctions, including higher monetary fines and imprisonment, are appropriate.[9]

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that the defendants, the Alabama Department of Transportation, the Alabama State Personnel Department, Jimmy Butts (Director of the Transportation Department), and Thomas G. Flowers (Interim Director of the Personnel Department), shall pay into the registry of the court the sum of $50,000.00 for each day that they fail to comply in full with the orders entered by this court on May 8, 1998 (Doc. nos. 2654 & 2659), for up to ten days.

**8.** Admittedly, during the June 25 proceeding before Judge Walker, the parties mainly focused on the impending crisis situation and the impact of the training requirements on that crisis. However, the parties also recognized the need to address the training requirements with regard to provisional and permanent appointments in general. Nevertheless, with this order and the July 1 order, the court hopes that it has reminded the parties that the crisis, while needing immediate attention, cannot supersede the continuing, urgent need for open and competitive race-neutral promotional procedures for both provisional and permanent appointments.

During the June 25 proceedings, the following exchange occurred between the defendants' counsel and Judge Walker:
"MR. ELLIOTT: If what I have heard is correct, it seems to me that, first of all, we need to be relieved from the obligation to go forward with the second meeting to determine the screening obligation.
"THE COURT: I think you should.... I'm sorry. Relief from the second meeting to address screening?
"MR. ELLIOTT: To address screening—
"THE COURT: I thought you were going to address screening today.

"MR. ELLIOTT: No. No. It doesn't make any sense to if—
"THE COURT: I understand. but I thought you originally were to address screening today. So, I'm just making clear that it was to be part of this meeting. And what you are saying now is it doesn't make[ ] any sense. Which is, essentially, what I just said.
So I will relieve you of the obligation to discuss the screening henceforward for the rest of the day."
Transcript of hearing before United States Magistrate Judge Susan Russ Walker held June 25, 1998, at 26–27. The court views Judge Walker as having relieved the defendants of their obligation to "discuss the screening ... for the rest of the day," that is, for the rest of June 25 only. Otherwise, the obligations placed by the court on the defendants with regard to developing a screening proposal remain. The defendants must still have the additional meeting and file the required report, as set forth in the court's order, entered May 8, 1998 (Doc. no. 2659).

**9.** The court still has before it, though not yet under submission, the motion to vacate filed July 1, 1998 (Doc. no. 2924), by defendants Alabama State Personnel Department and Thomas G. Flowers. This order should not be viewed as having addressed that motion.